Argued May 24; modified July 12, 1949

GULICK *v.* COPELAND

207 P. 2d 1042

*Elton Watkins,* of Portland, argued the cause and filed a brief for appellant.

*Dean F. Bryson,* of Portland, argued the cause and filed a brief for respondents.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, BAILEY and HAY, Justices.

**BAILEY, J.**

Plaintiffs, Dr. W. F. Gulick and Ruth Marie Gulick, his wife, brought this suit against defendant, George B. Copeland, to require the defendant to specifically perform a contract whereby the defendant agreed to sell to plaintiffs, and plaintiffs agreed to purchase from the defendant, the south 50 feet of Lots 1 and 2, resubdivision of portion of Davis Addition to Mount Tabor, within the corporate limits of the City of Portland, Oregon. From a decree granting plaintiffs the relief prayed for, the defendant has appealed.

The contract above referred to was entered into on the 20th day of December, 1942. The purchase price of the property sold by defendant to plaintiffs was $6,075, payable $1,000 on the execution of the contract

> "and the remainder of Five Thousand, Seventy five and 00/100 dollars to be paid at not less than $50.83 in monthly payments for six months and thereafter at not less than $60.83, including interest payable on the 20th day of each and every month hereafter until the said balance be fully paid, said deferred payments to bear interest at the rate of six per cent. per annum, payable monthly from the date of this instrument, until fully paid; the first of said monthly payments to be made on the 20th day of January, 1943.

"When the seller's interest is satisfied he agrees to execute and deliver by warranty deed the above described property, subject to the mortgage now of record."

The contract further provides as follows:

"And the second parties [vendees], in consideration of the premises, hereby agree that they will pay all of the taxes becoming due and payable in the year 1943, and all taxes hereafter levied against said property, * * * before the same or any part thereof becomes past due, and that all buildings now erected on said premises will be kept insured against fire in an amount not less than Five Thousand Dollars in a company satisfactory to first party. Policy in favor of first party as his interest may appear."

It is further provided that if the vendees (parties of the second part)

"shall pay the several sums of money aforesaid, punctually and at the times above specified, and shall strictly and literally perform all and singular the agreements and stipulations aforesaid, according to the true intent and tenor thereof, then the first party shall give unto the second parties, their heirs or assign, * * * an Abstract or Title Insurance Policy showing marketable title continued as to—and a good and sufficient deed of conveyance * * *. The interest on the unpaid balances shall first be deducted from each payment and the remainder applied on principal.

"But in case the second parties shall fail to make the payments aforesaid, or any of them, punctually and upon the strict terms, and at the times above specified, or fail to keep any of the other terms or conditions of this agreement, time of payment and strict performance being declared to be of the essence of this agreement, then the first party shall have the right to declare this agreement null and void, or foreclose by strict foreclosure in equity,

and in either of such cases, all the right and interest hereby created or then existing in favor of the second party derived under this agreement, shall utterly cease and determine, and the premises aforesaid shall revert and revest in the first party without any declaration of forfeiture or act of re-entry, or without any other act by first party to be performed and without any right of the second party of reclamation or compensation for money paid or for improvements made as absolutely, fully and perfectly as if this agreement had never been made."

Plaintiffs paid defendant on the purchase price $1,000 at the time of the execution of the contract, thereafter monthly installments of $50.83 for three months, $50.80 for three months, and $60.80 for 34 months. After the April 20, 1946, installment was paid there was, according to defendant's computation, an unpaid balance of $3,581.34 on the contract, and, according to plaintiffs' contention, the unpaid balance amounted to only $3,222.97, the difference in amount being a credit of $300, with interest, which plaintiffs claim they are entitled to because of dental work done by Dr. Gulick for Mrs. Anie Brown and her son. Both plaintiffs and defendant agree that there was due on April 20, 1946, on the mortgage on the property the sum of $2,853.87.

On May 2, 14, and 27, 1946, plaintiffs' attorney wrote letters to George B. Copeland and Mrs. Anie M. Brown, his agent, stating that the plaintiffs were desirous of paying the balance on the contract and receiving a deed and title insurance policy and asking them to advise him the exact amount owing on the contract. No answer was received from either Copeland or Mrs. Brown to any of those letters. Again, on November 26th of the same year, another letter was written by plaintiffs' attorney to Copeland and Mrs. Brown

in which the attorney stated that plaintiffs desired to pay the balance due and receive a deed and that the money necessary to pay the balance of the purchase price was in his office and that plaintiffs were ready, able and willing to pay the same immediately upon tender of a proper deed, together with title insurance. Again, no answer was received.

In the original complaint, filed on April 21, 1947, plaintiffs allege the amount of money which had been paid on the contract, according to their computation, and the amount due on the mortgage. It is then averred that the difference between the unpaid balance on the contract and that on the mortgage was $766.56, which sum plaintiffs tendered into court for defendant's benefit. Plaintiffs asked that defendant be required to deed the property to them subject to the mortgage.

An amended complaint was filed on February 24, 1948, the day when the trial of the cause began. In the amended complaint, plaintiffs allege the execution of the contract hereinbefore mentioned, the payments made by them to defendant, the amount of the balance remaining unpaid to defendant on the contract, the amount unpaid on the existing mortgage on the property, and the amount paid in court on the filing of the original complaint. It is then alleged that the balance due from plaintiffs to defendant, over and above the amount of the mortgage, "as of this day" is $178.94, which amount plaintiffs paid to the county clerk for defendant's benefit. Plaintiffs asked that defendant be required to convey the property, hereinbefore described, to them, subject to the existing mortgage thereon, "and that the sum of $945.50 tendered by plaintiffs to the county clerk of Multnomah County, Oregon, for defendant, be declared to be the full payment due by plaintiffs to defendant under said contract".

Defendant, in his answer, denied "plaintiffs' complaint and the whole thereof, save and except wherein defendant's separate answer and cross complaint expressly admits or coincides with any of the allegations of plaintiffs' complaint." In a separate answer and by way of counterclaim defendant sets forth the execution of the contract, the provisions thereof, the initial payment thereon of $1,000, six payments of $50.85 and 34 payments of $60.80, amounting in the aggregate, according to the allegations of the answer, to $3,372.30. It is then alleged "that after deducting the interest on said contract as therein provided the remainder paid by plaintiffs to defendant on the principal sum of said contract amounted to the sum of" $2,485.02, leaving a balance due as of April 20th, 1946, of $3,589.98. Defendant further alleges that the plaintiffs have failed and neglected to pay the taxes on the property and the premiums on the insurance policies covering the building thereon, and have failed and refused to continue payments on the purchase price subsequent to April 20, 1946. Defendant asks for an order dismissing "plaintiffs' complaint with prejudice, and for a decree strictly foreclosing said contract, and any right, title or interest the plaintiffs may have in the aforesaid real property," for attorney's fees, and for costs and disbursements.

The reply denies each and every allegation of defendant's answer "save and except as is expressly admitted, stated or qualified in plaintiffs' complaint on file herein."

The Circuit Court found that the plaintiffs paid, on April 28, 1943, the sum of $300 on the principal, which sum is one of the items here in dispute, and that the plaintiffs, "to the best of their ability, tendered to

the county clerk of Multnomah County, as clerk of the Circuit Court, the sum which, according to their figures, was the proper balance due under said contract, said sum tendered to court being $945.50." The Court further found that the plaintiffs "made no wilful default in payments due under the contract or in amounts tendered to court, but made an erroneous calculation in the balance due under said contract and there is the further sum of $22.11 due by plaintiffs to defendant under the terms of said contract." In the decree the Circuit Court ordered the plaintiffs to pay to defendants the further sum of $22.11 and ordered and directed the defendant to convey to the plaintiffs the property hereinbefore described "free and clear of all encumbrances save and except the first mortgage to Business Men's Assurance Company of America in the amount of $2,580.05".

We shall first consider defendant's last assignment of error which asserts that the Circuit Court committed error in denying defendant "the relief prayed for, to wit: cancellation of the contract and strict foreclosure."

Plaintiffs complied with the terms of the contract as monthly payments up to and including the April 20, 1946, installment. They then decided to pay the unpaid portion of the contract that was in excess of the balance due on the mortgage and to receive a deed for the property subject to such mortgage. They did what they could to procure from the defendant a statement of the amount necessary for them to pay to accomplish this purpose. They did not know the actual amount which they owed the defendant for taxes paid by him. They had not, up to that time, paid the taxes on the property or reimbursed the defendant for the taxes paid by him. And there was also some question whether they owed

the defendant for premiums on insurance policies which he may have paid. That plaintiffs were ready, able and willing, on and after April 20, 1946, to pay the balance due from them to him on the contract, in excess of the unpaid balance of the mortgage, is established by the overwhelming weight of the evidence.

It was not until after the institution of this suit that defendant sought a strict foreclosure of the contract. By seeking such a foreclosure in his counterclaim defendant recognizes that the contract between him and plaintiffs is still in force and presently subsisting, for the purpose of such a proceeding is to get rid of plaintiffs' equity in the property. *Flanagan Estate v. Great Cent. Land Co.,* 45 Or. 335, 77 P. 485; *Crider v. Turnbow,* 162 Or. 622, 94 P. (2d) 285. Defendant is seeking equitable relief, and, being in a court of equity, he must do equity. *Flanagan Estate v. Great Cent. Land Co.,* supra. In support of his contention that he should be granted a strict foreclosure of the contract here involved, defendant quotes the following excerpt from *Harrington v. Birdsall,* 38 Neb. 176, 186, 56 N. W. 961, 964, which was quoted with approval in the Flanagan Estate case:

> "The remedy by strict foreclosure of land contracts cannot be resorted to in all cases. The remedy being a harsh one, courts of equity will decree a strict foreclosure only under peculiar and special circumstances. Applications of that character are addressed to the sound legal discretion of the court, and they will be granted in cases where it would be inequitable to refuse them. If the vendee or purchaser has not been guilty of gross laches, nor unreasonably negligent in performing the contract, a strict foreclosure should be refused on the ground that it would be unjust, even though the vendee may have been slightly in default in making a payment.

So, for the same reason, a strict foreclosure will be denied where the premises have greatly increased in value since the sale, or where the amount of unpaid purchase money is much less than the value of the property. On the other hand, if the vendee, without sufficient excuse, fails to make his payments according to the stipulations of his contract, and for an unreasonable time remains in default, the vendor may have a strict foreclosure of the contract for the sale and purchase of the land, unless some principle of equity would be thereby violated.''

In the instant case the plaintiffs have paid a large proportion of the purchase price. Since the contract was entered into the value of all, or practically all, residential property in Oregon has greatly increased. The court will take judicial notice of this fact. The unpaid balance on the contract is probably not in excess of 25% of the present value of the property. Plaintiffs were not guilty of gross negligence or unreasonably negligent in performing the contract. Guided by the rule laid down in the foregoing excerpt a great injustice would be done plaintiffs to allow defendant's request for a strict foreclosure of the contract, and therefore the same is denied.

In another assignment of error defendant contends that the court erred ''in holding that vendee made tender and that the same was made at the proper time and in the proper amount and under proper conditions.'' The only finding by the court on that subject was that plaintiffs had ''made an erroneous calculation in the balance due under said contract'' from them to defendant of $22.11. Reference has hereinbefore been made to the letters written by plaintiffs' attorney to defendant to ascertain the exact amount due defendant and to the amounts of money paid by plain-

tiffs to the clerk of the court upon the filing of the original and amended complaints. The amended.complaint alleges that at all times since May 2, 1946, plaintiffs have been ready, able and willing to pay to defendant the balance due him under the contract, and Dr. Gulick testified that he was "willing to pay what is actually due" defendant.

In some jurisdictions the party asking a specific enforcement of a contract must aver and prove an actual performance, or offer of performance, of the contract prior to the commencement of the suit, while in other jurisdictions it is sufficient to show that the party seeking performance is ready, able and willing to perform his obligations under the contract. Pomeroy, Specific Performance of Contracts, 3rd Ed., § 360, p. 767; 49 Am. Jur., Specific Performance, §§ 40 and 143, pp. 53 and 166; 58 C. J., Specific Performance, § 488, p. 1163. The assignment now under discussion is without merit.

Defendant also assigns as error the allowance to plaintiffs of a credit on the contract of $300 for dental work performed by Dr. Gulick for Mrs. Anie M. Brown and her son. Mrs. Brown is a sister-in-law of defendant Copeland. She acted as his agent in the sale to plaintiffs of the property here in controversy. Dr. Gulick testified that he did not know that Mr. Copeland was the owner of the property

> "until we were at the attorney's office. When we got into the attorney's office to make out the final papers and gave her [Mrs. Brown] the second $500 check, which was to complete the $1,000 down payment, that is the first I knew that Mr. Copeland, the property was deeded to him. At that time I asked Mrs. Brown in such a case as this who do I make the second check out to, and it was agreeable

at that time to Mr. Copeland and Mrs. Brown the check be made out to Mrs. Brown.

"Q. Did you have any conversation as to who would give receipts for these payments? A. The only conversation I can recall is being made out to Mrs. Brown, that Mrs. Brown would submit the receipts.

"Q. Mr. Copeland said that was satisfactory to him? A. Satisfactory. * * *"

There was introduced in evidence, over defendant's objection, a purported receipt written by Dr. Gulick on his professional stationery, signed by Mrs. Brown, and reading as follows:

"Pd. 300.00 on account for House 48 S. E. 61st Ave. bringing balance to date—April 28, 1943, to $1,-436.00 including check, date April 28-43, check No. 141—

Mrs. Anie M. Brown"

Check No. 141 was for a monthly installment of $50.80 dated April 28, 1943. Dr. Gulick testified that this was a receipt for work done for Mrs. Brown and her minor son, "in the amount of $300, a figure agreed upon by both of us, $1,436." At the time this receipt was signed by Mrs. Brown, Dr. Gulick had paid only four installments on the purchase price. These payments were made by checks payable to Mrs. Brown. All subsequent payments were made in like manner.

Mrs. Brown testified that this $300 was for dental work done for her and her minor son by Dr. Gulick. She stated that she told Mr. Copeland about the matter and "he didn't want that to have anything to do with his papers." She further testified:

"* * * Well, Mr. Copeland objected then? A. Absolutely. And I told Dr. Gulick, and I told him I wanted him to fix—

"Q. (Interrupting) You say you told Dr. Gulick? A. Yes.

\* \* \*

"Q. Well, in other words, in answer to Judge Dobson's question, you have already said you told Dr. Gulick Mr. Copeland would not stand for that credit? A. That is right."

Mrs. Brown further testified that the dental work which Dr. Gulick did for her and her son was unsatisfactory. In regard to this matter she stated:

"\* \* \* And my dental work was not satisfactory—it had to be done by a good dentist in this town.

"Q. What did you do with this work? A. I took it over and left it and told the Doctor it was his.

"Q. Left it at his office? A. Yes. \* \* \*"

Dr. Gulick did not deny that Mrs. Brown had told him that Copeland "would not stand for that credit" of $300, nor did he deny what she said about her dental work.

Mr. Copeland gave the following testimony about the $300 credit:

"The Court: Did you authorize that credit? The Witness: No, I did not.

\* \* \*

"The Court: Did Mrs. Brown ever report the matter to you? The Witness: She did afterwards, yes, but I didn't approve of it.

\* \* \*

"The Court: Did you ever see this, Mr. Copeland (showing witness receipt for $300)? The Witness: No, your Honor, I never did."

We quote further from his testimony:

"Q. But when you heard about the credit Dr. Gulick had taken for $300 on your contract what did

you say or do about it—object or not? A. I objected to Mrs. Brown about it, yes.

\* \* \*

"Q. In this receipt, 'Paid $300 on account, bringing balance to date April 28, 1943 to $1436.00,' did you know that that had been done? A. No, I didn't.

\* \* \*

"Q. I will ask you this question: You testified you told Mrs. Brown she wasn't to give Dr. Gulick a receipt for these dental services, is that correct? A. I didn't tell her that.

"Q. What did you say on direct examination? A. I didn't know anything about it until afterwards.

"Q. Did you ever talk to her about it? A. After that time yes.

"Q. You talked to her? A. Yes.

"Q. I think you said you told her she was not supposed to do that? A. That is right.

"Q. Did you ever tell Dr. Gulick that? A. I never told Dr. Gulick. Dr. Gulick never mentioned it to me.

"Q. And you never mentioned it to Dr. Gulick? A. No.

"Q. In fact, you never talked to Dr. Gulick about that $300? A. No.

"Q. You never told Dr. Gulick he wasn't being credited with it? A. I did not."

Under examination by the court, Copeland testified that he never heard about the purported $300 credit "until Mrs. Brown started complaining about her teeth," which was probably six months after the dental work had been done. We quote:

"The Court: Did she then tell you she had had this work done, and in order to pay Dr. Gulick at that time she had given him credit on this contract? The Witness: Yes.

"The Court: She told you that? The Witness: Yes.

"The Court: Did you write Dr. Gulick or let him know that you refuted any such arrangement? The Witness: No, I didn't."

Plaintiffs, in their brief, state that they "do not argue that it [$300 credit] was an authorized act, but strongly argue that he, the vendor, did ratify this credit and act of his agent Brown, whether it was authorized or unauthorized." It is admitted by everyone concerned that Copeland authorized Mrs. Brown to collect and receipt for the installments as they became due. Copeland told Dr. Gulick that such arrangement was satisfactory to him and Dr. Gulick acted apparently upon that authorization. There is, however, no evidence that Copeland authorized Mrs. Brown to give Dr. Gulick credit on the purchase price for dental services which he might furnish to her and to her son. Dr. Gulick does not claim that he ever talked to Copeland about that matter and he does not deny, as has already been pointed out, that Mrs. Brown told him that Copeland would not stand for such a credit on the contract.

In support of their contention that Copeland ratified Mrs. Brown's act in giving plaintiffs credit for $300 on the purchase price, plaintiffs quote from *Cranston v. West Coast Life Ins. Co.,* 72 Or. 116, 130, 142 P. 762, the following:

"* * * Silent acquiescence with full knowledge of the material facts may amount to a ratification if continued for an unreasonable length of time, and third persons have acted in reliance upon and have been prejudiced by such acquiescence, especially where an agent, not a stranger, has exceeded his authority. 1 Elliott, Contracts, § 459.

"In many cases a ratification will be inferred from the mere habits of dealing between the parties. \* \* \*"

The foregoing excerpt is immediately preceded by the following statement: "Whenever a principal accepts the benefits of his agent's unauthorized acts with knowledge of all the material facts, he ratified the same."

10. In the instant case the crediting of this $300 on the purchase price was not for the benefit of Copeland. It was entirely for the benefit of Mrs. Brown and plaintiffs. So far as is disclosed by the record Dr. Gulick did not perform any service for Mrs. Brown after Copeland was advised of this credit. There is no evidence that Dr. Gulick was prejudiced by the failure of Copeland to personally notify him that he disaffirmed what had been done by Mrs. Brown. Mrs. Brown had no authority, either express or implied, from Copeland to give plaintiffs any credit on the contract for work performed by Dr. Gulick for herself and her son, and her act in so giving this credit has not been ratified, either expressly or impliedly, by Copeland. The Circuit Court erred in allowing this credit.

We have carefully considered the entire record and are of the opinion that the facts in the case justified the Circuit Court in granting plaintiffs a decree of specific performance, and that the only error committed by that Court was in allowing this $300 credit. The decree appealed from is therefore modified so as to require the plaintiffs to pay to the clerk of the Circuit Court, for the benefit of defendant, the additional sum of $300, with interest thereon at the rate of 6% per annum from April 28, 1943. Costs will be allowed in this Court to appellant Copeland.