Argued September 9, reversed September 22, petition for
rehearing denied October 20, 1954

## CITY OF REEDSPORT *v*. HUBBARD ET UX.

274 P. 2d 248

*Edward M. Murphy* argued the cause for appellants. On the brief were Yates, Murphy & Carlson, of Roseburg.

*Carl M. Felker* argued the cause for respondent. On the brief were Geddes & Felker, of Roseburg.

Before ROSSMAN, Presiding, and LUSK, BRAND, TOOZE and PERRY, Justices.

TOOZE, J.

This is a suit for strict foreclosure of a contract for the sale of real property, brought by the city of Reedsport, a municipal corporation, as plaintiff, against Russell J. Hubbard and Eva K. Hubbard, his wife, as defendants. Decree was entered in favor of plaintiff; defendants appeal.

On May 6, 1941, plaintiff entered into a written contract to convey certain river frontage and sawmill site property within the city limits of Reedsport, in Douglas county, Oregon, to the defendant Russell J. Hubbard. The city had acquired title to this property by virtue of a conveyance from the county of Douglas, the county having acquired its title through delinquent tax foreclosure proceedings.

In addition to a cash consideration of $150 to be paid by defendant Hubbard to plaintiff, the contract provided that the defendant should construct on the property and put in operation a sawmill having a capacity of not less than 50,000 feet of lumber for an eight-hour shift. The contract recited that the title to the lands was defective and provided that the defendant should, at his own expense, institute in the name of the city of Reedsport, as plaintiff, and diligently prosecute to final determination, a suit to quiet the title to the property. It was provided that such suit should be commenced within thirty days from the date of the contract. The agreement also provided that the defendant should be entitled to the exclusive possession of the property from and after the date of

the commencement of the suit and so long as he kept and performed the obligations on his part to be performed, subject to certain rights of Kern & Kibbe.

The contract contained the following specific provisions:

"* * * that he [defendant Hubbard] shall begin construction of said mill on said property within forty-five days after a decree is entered by the Circuit Court of the State of Oregon for Douglas County as hereinafter provided for, and shall have said mill completed and in operation within six months from the date of the beginning of construction; * * *.

"IT IS FURTHER UNDERSTOOD AND AGREED that in the event the Second Party is delayed in the construction of said sawmill or securing the equipment therefor by any federal or other regulation which gives priority to material, supplies, equipment or machinery ordered by or being furnished to the United States or any of its agencies, which prevents or delays the manufacturer or dealer in any material, supplies, equipment or machinery necessary for the construction of said mill in supplying or furnishing such material, supplies, equipment or machinery promptly to the Second Party, or should be delayed in the construction of said mill on account of strikes, acts of God, *or any other act or thing occurring over which the Second Party has no control,* that the time of any delay or delays so caused shall operate as an extension of the time in which the Second Party is to start and/or complete construction of said mill, and the time for the final completion of said mill shall be extended for a period of time equal to such delay.

"IT IS FURTHER UNDERSTOOD AND AGREED that in the event the Second Party fails or makes default in the following particulars:

"(a) In starting the construction of said mill within the time herein provided, or

"(b) Fails to complete and have said mill in operation by the time herein provided,

then this contract shall be void and of no further force or effect, and the First Party may reenter and repossess itself of the hereinbefore described real property and remove all persons therefrom, and all rights and interest hereby created or existing in favor of the Second Party, his heirs or assigns, or derived under this contract shall utterly cease and determine."

Defendant paid the $150 cash consideration, within the thirty day limitation caused the suit to quiet title to be commenced, and immediately went into possession of the property. As soon as defendant took possession of the property, he began to make extensive plans for the construction of a sawmill. He repaired an old mill building on the premises, cleaned up the debris, and built an assorting chain and planer shed, expending from $10,000 to $12,000 therefor. He also employed a mill designer, acquired sawmill machinery of the approximate value of $54,000, and arranged for a loan of $75,000 as operating capital.

At the outset, it was anticipated that the decree in the suit to quiet title would be obtained by default. However, two of the defendants filed answers to the complaint, and a taxpayer moved to intervene in the suit. As an affirmative defense and by way of cross complaint, one of the defendants, Umpqua Mills and Timber Company, a corporation, attacked the validity of the contract between plaintiff and defendant. A similar attack was made by the proposed complaint in intervention.

On December 19, 1941, an order was entered sustaining a demurrer to the cross complaint of defendant Umpqua Mills and Timber Company, and also denying the motion of the taxpayer to intervene. On February

17, 1942, the taxpayer, Umpqua River Navigation Company, a corporation, gave notice of appeal to the Supreme Court from the order denying intervention. However, the appeal was not perfected and was eventually dismissed. But O. H. Hinsdale, secretary-treasurer of Umpqua River Navigation Company, who had verified the proposed complaint in intervention, and after the motion to intervene had been denied, told defendant that his company intended to commence an independent suit based upon the same grounds as set forth in the complaint in intervention.

A reasonable fear upon the part of defendant that such threat of independent litigation would be carried into execution was justified by a consideration of some of the language used in the written memorandum of the trial judge respecting the demurrer to the cross complaint of defendant Umpqua Mills and Timber Company, and the motion to intervene. The trial judge wrote as follows:

"It is further alleged that the plaintiff proposes to and, unless enjoined by this court, will carry out a contract entered into between the plaintiff and Russell J. Hubbard for the transfer by the plaintiff to Hubbard of the land described in the complaint for the consideration of $150.00 and the construction of a sawmill on said property, said sawmill to be owned exclusively by Hubbard. It is alleged that this land is of the value of $5,000.00 and that at the time said contract was entered into with Hubbard, the City of Reedsport had a bona fide offer from a responsible taxpayer of said county for the purchase of said property for not less than $5,000.00; and it is further alleged that shortly prior to the making of said contract, plaintiff received $500.00 for the temporary use of a portion of said land described in the complaint. With reference to this feature of the third further

and separate answer, it is unnecessary at this time to determine the question as to whether or not a taxpayer has the right to enjoin the sale of property worth $5,000.00 for a consideration of $150.00 and the construction of a sawmill upon the property. What might be the law upon that question, if presented in an injunction suit, is not presented by the answer in this case for the reason that, in my opinion, said matters may not properly be pleaded as a defense or counterclaim to the matters set forth in the complaint.

"The rule that, where an unlawful expenditure of public money has been made and the proper authorities refuse to compel or attempt to compel its restitution, a taxpayer, on behalf of himself and others similarly situated, may bring suit to recover such public money for the benefit of the public corporation which paid it out, is well settled in Oregon. McKenna vs. McHaley, 62 Or. 1; 123 Pac. 1069; Gosso vs. Riddell, 123 Or. 57, 261 Pac. 77; Young vs. Gard, 129 Or. 534; 277 Pac. 1005. This rule, I assume, applies equally to the recovery of property wrongfully disposed as to money unlawfully expended. It does not apply in this case, however, for the reason that the third further and separate answer pleads neither a defense nor a counterclaim to the cause of suit set forth in the complaint.

"The Umpqua River Navigation Company has filed a motion for permission to intervene and has tendered for filing a complaint in intervention, alleging substantially the same matters pleaded in the third further and separate answer of the defendant Umpqua Mills & Timber Company, although upon a somewhat different theory. Whether the facts alleged would be sufficient to state a cause of suit if set forth in an original suit, it is unnecessary in this suit to determine. In my opinion, they do not state a defense or counterclaim to the cause of suit set forth in the complaint. The motion to intervene will, therefore, be denied."

The proceedings in the suit to quiet title having taken the turn which they did, defendant became fearful that the litigation in the suit would be prolonged, and that he might never acquire title to the property. As a result, in December, 1941, he entered into negotiations for the transfer of the mill machinery to a partnership (he owned a fifth interest therein) located at Sutherlin, in Douglas county. The sale was made, and the machinery and other equipment were moved to Sutherlin in February, 1942. This country was then at war, and defendant explained that it was his desire to get the machinery and equipment into operation before it was seized by others possessing a government priority.

Eventually defendant made a settlement with the two answering defendants in the quiet title suit, paying one defendant the sum of $500 for its alleged interest in the property, and thereupon, on June 19, 1942, a final decree quieting title was entered. Under this decree and pursuant to the terms of a settlement between defendant and Kern & Kibbe, defendant acquired title to the following described personal property: The spur railroad tracks leading from the Southern Pacific main spur to the dock, including all rails, stringers, ties, switches, fastenings, etc.; one cylinder oil storage tank with equipment, water tank, all water and oil pipes and power lines; one Shay locomotive, built by Lima Locomotive Company; and one derrick, complete with lines and equipment.

At the time the final decree was entered in the suit to quiet title, there was in effect order L-41, issued by the War Production Board of the United States Government. Under the order, all new sawmill construction required the approval of the War Production Board. Immediately after the decree was en-

tered, defendant undertook proceedings to obtain the approval of the War Production Board for the construction of a sawmill upon the property in question at Reedsport. His application was denied. He made a trip to Washington, D. C., in an endeavor to secure such approval. Moreover, he frequently conferred with Mr. Frederick Herbert Brundage, of Portland, who had been appointed Western Log and Lumber Administrator in the office of the War Production Board, in an endeavor to secure a removal of the ban on the proposed construction at Reedsport. There is but little doubt that defendant acted in good faith. However, all his efforts to secure approval of the War Production Board failed. The wartime restrictions were not removed until some time in October, 1945.

However, on September 9, 1943, the city of Reedsport commenced this suit for strict foreclosure of the contract, alleging that defendant had failed to construct a sawmill on the property. In its original and amended complaints the city prayed for a decree declaring defendants to be in default in the contract and requiring them to put into operation a sawmill of the capacity provided for in the contract "within sixty days of the date of said decree or such other time as to the court may seem just and equitable in the premises". A general demurrer was sustained to the original complaint, and the amended complaint was filed on October 5, 1943. On October 22, 1943, defendants filed their answer to the amended complaint, in which it was alleged that portion of the contract which provided that the time for final completion of the mill might be extended in the event of delays occasioned by Government priorities or any other act or thing "occurring over which the Second Party, Hubbard, has no control". The defendants then al-

leged that the delay in constructing the mill was occasioned by Hubbard's inability to obtain government priorities and also by reason of the difficulties encountered in the quiet title suit.

On November 18, 1943, plaintiff filed a motion to make the answer of defendants more definite and certain in some respects, and to strike certain portions thereof. On June 22, 1944, an order was entered sustaining the motion in part, and denying it in others, but not requiring the filing by defendants of an amended pleading.

On July 11, 1944, plaintiff filed a reply, being a general denial of the new matter alleged in the answer. Therefore, on July 11, 1944, the case was at issue and ready for a trial date. However, no further action whatever was taken in the case until October 22, 1946, when plaintiff took defendant Hubbard's deposition.

Thereafter, and on March 13, 1947, an amended reply was filed by plaintiff. In this reply, plaintiff affirmatively alleged the following:

"VI.

"ALLEGES affirmatively that after said contract as alleged in the Complaint was entered into, and prior to the commencement of this suit, the defendant Russell J. Hubbard acquired all of the equipment, machinery and materials necessary for the construction of a sawmill on said premises and had said sawmill practically completed and had practically all of said equipment and machinery on said premises ready for installation; and that prior to the commencement of this suit the defendant sold all of said machinery, equipment and materials, a large portion of which was already installed in said sawmill on said premises, and removed the same from said premises without ever completing the construction of said sawmill, and that he has not since said time constructed any sawmill thereon,

but has remained in possession of said premises continuously since first going into possession thereof after the execution of said contract."

On April 21, 1947, the matter was tried to the court. The evidence disclosed the facts as hereinabove stated. Upon the trial, the gist of plaintiff's contention was that because defendant had in his possession the necessary equipment to complete the construction of a sawmill in 1941 and early 1942, some several months before he was required to perform under the contract, his inability to secure approval of the War Production Board when time for performance arrived offered no excuse for his delay and established a default on his part.

Upon the trial it developed from the evidence that while defendant had been in possession of the property, he had received substantial income from rentals, particularly from the use of the personal property he had acquired from Kern & Kibbe.

On May 1, 1947, plaintiff moved for permission to file a supplemental complaint. The gist of this proposed complaint was that defendant had not constructed a sawmill since the commencement of the suit. On December 16, 1947, the motion to file supplemental complaint was denied. Plaintiff, on March 16, 1948, filed a second motion for permission to file a supplemental complaint. An order was entered denying the motion on July 22, 1949.

On November 21, 1951, the trial court entered of record its findings of fact and conclusions of law. We quote the following portions thereof:

"9. That said defendant took possession of said real property pursuant to said contract prior to June 6, 1941, and in pursuance of his obligation under said contract, did construct and substantially

complete a sawmill of the required capacity on said property prior to the entry of the above mentioned decree in said suit to quiet title, but at no time did he ever put said mill into operation.

"10. That in the fall of 1941 said defendant commenced to and thereafter did voluntarily disassemble and remove the sawmill machinery, and equipment from said mill property and at no time thereafter has replaced, reassembled, and reconstructed said machinery and sawmill on said real property.

"11. That the failure of said defendant to place said sawmill into operation and to comply with his obligations under said contract in constructing and placing a sawmill of the required capacity within the time required by said contract was a voluntary failure on his part and was not caused by an inability to procure from the Federal Government and its agencies, priorities or permission to acquire and install the machinery necessary for the operation of said mill.

"* * * * *

"13. That the defendant, Russell J. Hubbard, has been in possession of said real property for a period of time commencing prior to June 6, 1941, and continuing until the present time. That from his use and possession of said premises and from certain personal property owned by him, he has obtained and received large sums of money, the amounts of which have not been determined in this suit; that an accounting for the rents and profits of said real property should be made.

"14. That after voluntarily disassembling and removing said sawmill, machinery and equipment from said mill and disposing of the same, and after the entry of the above mentioned decree quieting title to said real property, said defendant was prevented from constructing the sawmill required by said contract by reason of his inability to obtain priorities from the necessary federal agencies, and

at the time of the commencement of this suit, said priorities had not been obtained."

On the same day, November 21, 1951, and based upon the findings of fact and conclusions of law, the court entered an interlocutory decree, a portion of which reads as follows:

"That said defendant also hereby is allowed six months from the date on which said construction is started within which to complete the construction of said mill and to commence operation thereof, provided said construction is started within the above mentioned 45 day period.

"2. That in the event said defendant should fail or neglect to start the construction of said sawmill within the above mentioned period of time or to complete construction and commence the operation thereof within the above mentioned period of time, then and in either of said events the defendants, Russell J. Hubbard, and Eva K. Hubbard, and all persons claiming by, through, or under them shall forever be barred and foreclosed of all right, title, and interest of every name, nature, and description which they may have or claim in or to said real property and every part thereof, and that certain contract dated May 6, 1941, by and between the City of Reedsport, the plaintiff herein, and Russell J. Hubbard, one of the defendants herein, providing for the sale of said real property, shall be cancelled and forfeited and all sums of money theretofore paid by the defendant, Russell J. Hubbard thereunder and all improvements made by him on said real property shall be retained by the plaintiff.

"3. That in the event said defendant should fail or neglect to start the construction of said sawmill or complete the same and place it in operation, within the above mentioned times, the Sheriff of Douglas County, Oregon, shall be directed immediately to put the plaintiff in possession of said real property."

The defendant having failed to construct and place in operation the sawmill as provided in the interlocutory decree, a final decree was entered August 26, 1952, foreclosing the contract and directing that immediate possession of the premises be delivered to plaintiff. Paragraph five of this decree provides:

"5. That the above entitled court hereby retains jurisdiction in this suit to affect an accounting by the parties hereto for the rents and profits from said real property which have been received by the said Russell J. Hubbard during the period of time that he has been in possession of said real property and said parties hereby are granted and allowed a period of thirty days from the date hereof within which to file herein such appropriate pleadings as they may deem necessary to determine said accounting."

Defendants first contend that the suit should have been dismissed because it was prematurely commenced, and that the trial court erred in not dismissing it.

■ It is elementary that if at the time a suit is commenced, a cause of suit has not accrued and does not exist, the suit should be dismissed. The defect cannot be cured by the filing of a supplemental complaint for a cause of suit arising thereafter. The rule is stated in 1 CJS 1391, Actions, § 125d, as follows:

"In equity, if there is no cause for equitable relief at the time the bill is filed, it cannot be maintained upon a cause accruing thereafter, * * *."

In *Clark v. Morrison,* 80 Or 240, 245, 156 P 429, it is stated:

"We do not discuss the allegations of the supplemental complaint, for the reason that an original complaint which states no cause of action cannot be remedied by a supplemental pleading setting up matters which have occurred since the commence-

ment of the action: 13 Cyc. 504; 21 Ency. Pl. & Pr. 18, 19.''

See also *May Stores, Inc. v. Bishop et al.,* 131 Or 670, 672, 282 P 1080; *Bergin v. Temple,* 111 Mont 539, 111 P2d 286, 133 ALR 1115; *American Agricultural Chem. Co. v. Thomas,* 206 SC 355, 34 SE2d 592, 160 ALR 594, 598.

If defendant was not in default in the performance of the contract on his part to be performed on September 9, 1943, when the instant suit was commenced, then no cause of suit existed in favor of plaintiff. Subsequent events giving rise to a cause of suit in favor of plaintiff could be of no avail in the present proceeding. If at the time this suit was commenced, no cause of suit had accrued, then the suit was prematurely commenced and should have been dismissed.

■ The plaintiff and defendant entered into an agreement in writing which specifically prescribed their respective rights and obligations. The provisions of the contract are definite, certain, and wholly unambiguous. It is axiomatic that such a contract must be construed according to its plain terms.

■ Whether at the time this suit was commenced, the defendant was in default must be determined in the light of the express contract provisions. The court has no authority to read into said contract a provision which does not appear therein, nor to read out of it any portion thereof. And this is true, even though the result may appear to be harsh and unjust. The contracts of parties sui juris are solemn undertakings, and in the absence of any recognized ground for denying enforcement, they must be enforced strictly according to their terms. It is not the province of the court to rewrite a contract for the purpose of accomplishing

that which, in the court's opinion, might appear proper. ORS 174.010, 174.020; *Fendall v. Miller,* 99 Or 610, 196 P 381; *Sinnott v. Interstate Contract Co.,* 86 Or 189, 168 P. 81.

In 17 CJS 702, Contracts, § 296, it is said:

"It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, and, in the absence of any ground for denying enforcement, to enforcing or giving effect to the contract as made, that is, to enforce or give effect to the contract as made without regard to its wisdom or folly, to the apparent unreasonableness of the terms, or to the fact that the rights of the parties are not carefully guarded, as the court cannot supply material stipulations, or read into the contract words which it does not contain so as to change the meaning of words contained in the contract."

■ Under the express provisions of the contract, defendant was not required to commence construction of a sawmill until within 45 days after the final decree in the quiet title suit was entered. *That is the time expressly set for performance on his part.* What he may have done before that time is wholly immaterial. It also is immaterial that what he did prior to his sale and removal of sawmill machinery may have been done in preparation for carrying out the provisions of the contract when it came time for him to perform. All that activity was voluntary on his part and was in no way required by the contract. There is nothing whatever in the contract that would deny him the right to construct another sawmill and operate it elsewhere than in the city of Reedsport; insofar as the contract was concerned, he had a right to construct and operate

as many sawmills as he desired, and to construct and dismantle as many as he cared. Whether he defaulted in his contract with plaintiff is to be determined from the situation that existed at the time he was required to perform according to his agreement, and not as it had existed at some time prior thereto.

■ The record on the trial conclusively established the proposition that when the time for performance by defendant arrived, as provided in the contract, he could not perform because of inability to secure the approval of the War Production Board. Under the contract, that constituted an absolute excuse for the delay in performance. Defendant could not be in default for failure to perform so long as the ban of the War Production Board remained in effect. That ban was continuously in existence from the summer of 1942 until the fall of 1945.

The trial court adopted the theory of plaintiff that because at a time prior to the date for performance on his part the defendant had secured enough equipment to complete the construction of a sawmill, and had he retained it, could have performed when time for performance arrived, his inability to secure approval by the War Production Board for the purchase of the machinery and equipment necessary was no excuse for nonperformance. In this the trial court erred. By adopting that theory of plaintiff, the court, in effect, rewrote the contract of the parties; it read into it a new condition. That it could not do.

■ When the instant suit was commenced in September, 1943, defendant was not in default under his contract, and no cause of suit had accrued in favor of plaintiff. The suit should have been dismissed.

■ In October, 1945, all government bans against new sawmill construction were removed. Had the in-

stant litigation not been pending, it would have been the obligation of defendant to then perform his contract. However, the pendency of this suit was just cause for further delay in performance—a cause over which defendant had no control. Until it was finally determined whether his contract was to be strictly foreclosed, he was not required to perform.

■ Although on the merits this cause should have been dismissed, it also is true that it could and should have been dismissed for lack of prosecution not later than early in 1945. § 6-203, OCLA: *Reed v. First Nat. Bank of Gardiner,* 194 Or 45, 55, 241 P2d 109. It was the duty of plaintiff to prosecute the case with diligence. As the record shows, it was woefully neglectful in that respect in this case. Any inconvenience or loss it has suffered because of the delay in the prosecution of this suit is due to its own laches. In *Reed v. First Nat. Bank of Gardiner,* supra, we said:

> "Public policy demands that actions be diligently prosecuted. It is a duty of the plaintiff to prosecute his case with due diligence, and, if he fails in this duty, the consequences are the same as though no action had been begun. For a failure of plaintiff to perform his duty in the respects noted, the action may be dismissed for want of prosecution."

In fairness to counsel who appeared for the plaintiff on this appeal, it should be stated that they did not appear as attorneys for plaintiff until after the trial and are in no way responsible for the lack of diligence in prosecution.

■ Based upon the final decree entered in this suit, the plaintiff on September 25, 1952, filed in this cause a supplemental complaint in which it alleged that while in possession of the premises involved in this

litigation, the defendant received as rentals from the Umpqua River Navigation Company the sum of $34,-924.30, up to March, 1947, and since March, 1947, has received additional rentals and profits from the use of said property, the amount of which is to the plaintiff unknown; plaintiff prays for an accounting for such rentals and profits, and for a decree that it be declared the owner thereof, and that defendant be ordered to pay the same to plaintiff.

Proceedings upon said supplemental complaint await the final disposal of this cause upon this appeal.

The greater portion of the several sums of money received by defendant came from the rental of the personal property which defendant had purchased from Kern & Kibbe, and in which property plaintiff had no interest.

Under the law of this state, plaintiff is not entitled to the rents and profits in the use of said premises while defendant was lawfully entitled to and was in possession thereof under his contract. They belonged to defendant. In a suit for strict foreclosure of a land purchase contract the plaintiff vendor is not entitled to the rents and profits received by the vendee from the property during the time he is in default. *Grider v. Turnbow,* 162 Or 622, 646, 94 P2d 285. In this case Mr. Justice BAILEY, speaking for the court, said:

"* * * Nor is the plaintiff entitled to recover the reasonable rental value of the property for the time that the defendant has been in default in her payments. The contract gives the defendant possession of the real property, and by bringing suit for strict foreclosure the plaintiff admits that she is entitled to retain possession until barred finally by the decree of the court."

It is a well-established rule of law in Oregon that the institution of a suit for strict foreclosure of an

executory contract for the sale and purchase of land does not effect a cancellation of the contract, but rather is a recognition of its continued existence. The rights of the parties under the contract that are incident to ownership and possession are not affected until the court has entered its decree. The bringing of a suit for strict foreclosure is an affirmance of the contract. *Gulick v. Copeland,* 186 Or 640, 648, 207 P2d 1042; *McCracken v. Walnut Park Garage, Inc.,* 156 Or 697, 703, 68 P2d 123.

Commencing in June, 1941, when the suit to quiet title was begun, defendant was entitled to and did go into possession of the property and continued in possession thereof until final decree was entered in this suit. His possession was lawful, exclusive, and strictly in accordance with the provisions of the contract of sale and purchase.

■ Under an executory contract for the sale and purchase of land the vendee is treated in all respects as the owner of the property, although he has an equitable estate only. Until the contract is fully performed and the vendee is entitled to a conveyance of the legal title, the vendor retains the legal title simply as security for performance by the vendee.

In *Harder et ux. v. City of Springfield et al.,* 192 Or 676, 686, 236 P2d 432, Mr. Justice WARNER, in speaking for the court, quoted with approval the following from 2 Pomeroy, Equity Jurisprudence 5th ed, 21, § 368, respecting the relationship between a vendor and vendee under an executory contract for the sale of land:

> "*The vendee is looked upon and treated as the owner of the land;* an equitable estate has vested in him commensurate with that provided for by the contract, whether in fee, for life, or for years; al-

though the vendor remains owner of the legal estate, he holds it as a trustee for the vendee, *to whom all the beneficial interest has passed,* having a lien on the land, even if in possession of the vendee, as security for any unpaid portion of the purchase money. The consequences of this doctrine are all followed out. As the vendee has acquired the full equitable estate,—although still wanting the confirmation of the legal title for purposes of security against third persons,—he may convey or encumber it; may devise it by will; on his death intestate, it descends to his heirs, and not to his administrators; in this country, his wife is entitled to dower in it; a specific performance is, after his death, enforced by his heirs; *in short, all the incidents of a real ownership belong to it.*" (Justice WARNER's italics).

Also see *Sheenhan v. McKinstry et al.,* 105 Or 473, 483, 210 P 167, 34 ALR 1315.

█ In its brief, plaintiff devotes considerable space to a discussion of the jurisdiction of a court of equity in support of its contention that defendant should be required to account to it for the several sums of money received by him as rentals and profits for the use of the real and personal property while he was in possession. It says as to the jurisdiction of a court of equity:

"It takes a case as a whole, and having obtained jurisdiction in the first place, it proceeds to administer complete relief by whatever means that relief may be achieved, whether it be by requiring specific performance as a collateral matter, the payment of money, the execution of a deed, or any other matter."

It is true that the arms of equity are long and far-reaching in a proper case, but before an equity court is authorized to do the things suggested by plaintiff,

a cause of suit must not only be alleged, but also must be established by the evidence. In the instant case a cause of suit was alleged, but the evidence failed to establish its existence. As a consequence, the court had no authority other than to dismiss the suit. Moreover, as before stated, no accounting was due the plaintiff. For a discussion regarding the jurisdiction of a court of equity see *Walker v. Mackey et al.,* 197 Or 197, 207, 251 P2d 118, 253 P2d 280; *Powell v. Sheets,* 196 Or 682, 696, 251 P2d 108.

The decree is reversed and this cause is remanded to the trial court with directions to dismiss the suit. Neither party shall recover costs.