Argued November 28, 1956, affirmed November 13, 1957

# WEAVER ET AL *v.* WILLIAMS

317 P. 2d 1108

*W. C. Winslow*, Salem, argued the cause and filed briefs for appellant.

*Edward L. Clark, Jr.*, Salem, argued the cause for respondents. With him on the brief were Marsh, Marsh & Dashney, McMinnville.

Before WARNER*, Chief Justice, and ROSSMAN, PERRY** and McALLISTER, Justices.

* Chief Justice when case argued.
** Chief Justice when decision was rendered.

PERRY, C. J.

The plaintiffs brought this action April 3, 1953, to recover as damages the profits they would have received had the defendant not breached a contract to deliver logs to their sawmill. The general allegations of plaintiffs' amended complaint material to this opinion are as follows:

"I.

"That at all times herein mentioned the plaintiffs were co-partners conducting the business of operating a portable sawmill which was located in Section 36 and 25, Township 6 South, Range 10 West of the Willamette Meridian, Lincoln County, Oregon. That on or about November 1, 1950, the plaintiffs and the defendant entered into an oral contract for the logging and sawmilling of certain timber owned by the defendant and situated upon some 320 acres located in said tract which belonged to the defendant; that there was situate upon said 320 acres belonging to the defendant some three million feet of merchantable second growth timber and merchantable alder timber; that by the terms of the agreement between the plaintiffs and the defendant, the defendant was to log and deliver to a pond on said lands all the merchantable second growth and alder timber, and the plaintiffs would saw it for sale to remanufacturing plants; that Fifty percent (50%) of the proceeds of the sale of rough lumber was to be paid to the defendant for stumpage and logging and Fifty percent (50%) was to be paid to the plaintiffs for milling.

"II.

"That pursuant to said agreement hereinabove mentioned, the parties entered into performance on or about the 1st of November, 1950, and continued performing their obligation under the contract until on or about October 24th, 1951, at which time the contract was breached by the defendant and

further performance was rendered impossible on the part of the plaintiffs; that during the term the parties performed their contract, a total of 1,334,440 feet of rough lumber was manufactured and sold by them.

"III.

"That on or about October 24, 1951, the defendant refused to deliver any more logs to the log pond adjacent to the plaintiffs' mill and at same time loaded and hauled away from a cold deck next to said pond a total of 150,000 feet of logs which he sold to other purchasers."

The defendant by answer admitted the plaintiffs in November, 1950, commenced to manufacture lumber from logs furnished them by defendant and continued to manufacture lumber until in October, 1951, and generally denied the other allegation. As a further defense defendant alleged an accord and satisfaction. The plaintiffs' reply denied this new matter set up in the answer.

The evidence in this case shows the defendant was the owner of approximately 3,000,000 feet of growing alder and second-growth fir timber situated on 320 acres of land. Plaintiffs contacted the defendant for the purpose of logging this timber. The defendant advised the plaintiffs he was going to log the timber lands, but there was a "stud" mill that had been built on the land, which the owner had been unable to operate, and if the plaintiffs could get the mill he would deliver them logs. The plaintiffs then contacted a Mr. Jack Folsom and made arrangements to lease the mill, which they later agreed to purchase. After making arrangements to lease the mill, the plaintiffs again contacted the defendant and he told them "he would furnish logs for us to saw out for half. All the logs with the exception of one or two truck loads he said

would be too large for us to saw." "Mr. Williams [the defendant] was to furnish logs to the pond, in the pond. We were to sawmill the logs and haul the lumber away to the market and split the proceeds fifty-fifty." As the logs were milled into lumber, the lumber was sold by plaintiffs and the proceeds divided equally between the plaintiffs and the defendant. In the fall of the year 1951, and while the defendant was delivering logs for plaintiffs' use, the defendant started to "cold deck" some of the fir logs close to the mill. The plaintiffs testified they expected to use the logs from the "cold deck" during the winter months. About the middle of October, 1951, the defendant began to load logs out of the "cold deck" and haul them to another market where they were sold to others than the plaintiffs. There is no evidence as to the amount of logs in the "cold deck" too large for the mill to saw, but there is evidence that most of the logs in the "cold deck" were useable by plaintiffs' mill and that defendant only delivered to the plaintiffs some of the smaller ones out of the "cold deck." The plaintiffs estimated there were probably between 150,000 and 200,000 feet of timber in the "cold deck" and they were permitted to saw about a quarter of this amount. The plaintiff Gustafson testified that when the defendant commenced to remove logs from the "cold deck" the defendant told him he got more money for the logs by hauling them away. The plaintiff Weaver testified "when they first started loading them out I went down one day and asked Mr. Williams [the defendant] how many logs he was going to load out and, well, he says, 'that's my business and if you don't like it you can just go right now,' and so I just kept still then."

The evidence further discloses the plaintiffs were of limited financial means and practically without operating capital, and that the defendant was cogni-

zant of this fact. He advised the plaintiffs not to make their November payment on the purchase of the mill as logs might not then be available. The plaintiffs continued to operate the sawmill to manufacture lumber until they closed the mill on November 8, 1951. They testified that the reason they closed was because of lack of logs. They also testified that after closing the mill they were without funds and were unable to meet their payments on the contract to purchase the mill, thus the mill was lost.

While the alleged agreement was in effect the plaintiffs became indebted to the defendant in the sum of $1,244.30, which they evidenced by delivering to the defendant their promissory note. On January 26, 1952, the plaintiffs transferred to the defendant a pond saw, motor chains and bars of the value of approximately $500, which he accepted in full payment of the plaintiffs' indebtedness.

The jury returned a verdict for the plaintiffs and the defendant appeals.

The defendant assigns as error the trial court's denial of the defendant's motion, which is as follows:

"We move that the court limit the consideration of the jury in this case, in its consideration of damages, to any logs that were taken out of the cold deck by Mr. Williams and the loggers, upon the ground and for the reason that there is not any evidence here whatever to show that Mr. Williams ever refused to deliver further logs in the spring—there isn't anything to show that this arrangement was to continue all winter long—and the evidence is clear and conclusive to the effect that by spring the plaintiffs were not ready, able and willing to perform their contract. They were not there. They had lost the mill. They were in no position to perform—never tendered performance on their part—"

The defendant further assigns as error the refusal of the trial court to instruct the jury to the effect that in considering the question of damages they must consider only the loss of profits plaintiffs would have made from the logs removed from the cold deck and sold by the defendant to others. This presents the same issue as raised by defendant's motion above set out. The defendant also requested an instruction to the effect that, although there had been a breach of the contract, plaintiffs could not abandon the contract and recover damages for the total breach "unless they held themselves in readiness to receive further logs and manufacture the same in accordance with the terms of the contract."

The issue thus raised is—Was there a total breach which would warrant the plaintiffs in abandoning the contract and refusing further performance, or was the breach only partial and not of sufficient materiality as to the substance of the contract to warrant the plaintiffs in abandoning the contract?

The allegations of the plaintiffs' complaint, that "the defendant refused to deliver any more logs to the log pond adjacent to the plaintiffs' mill and at the same time loaded and hauled away from a cold deck next to said pond a total of 150,000 feet of logs which he sold to other purchasers," alleges an anticipatory breach coupled with an actual breach of the contract. The agreement as alleged in plaintiffs' complaint appears to be in the nature of a joint adventure, but it may be interpreted as a sale of the logs with the price to be determined therefor on the basis of the returns received from the sale of the lumber. Since it is apparent the parties treated this as a sale of logs in the trial court, we will so consider their agreement.

It should be noted that neither in the contract as

alleged nor from the evidence adduced at the trial could it be said that time was of the essence of the contract.

■ Speaking to the question of an anticipatory breach as alleged, the contract being executory in nature, such a breach could only arise by reason of the defendant's renunciation by act or deed of further performance before the time for his future performance had arrived. *Ratcliffe v. Union Oil Co. of Calif.*, 159 Or 221, 77 P2d 136; 12 Am Jur 969, Contracts § 391; 5 Williston on Contracts (rev ed) 3691, § 1296.

■ Satisfactory evidence to sustain an anticipatory repudiation must be susceptible of the conclusion that the promissor by his acts or deeds positively, unconditionally, unequivocally, distinctly and absolutely refused to perform his obligations that are to arise under the contract. *Swick v. Mueller et ux*, 193 Or 668, 676, 238 P2d 717.

The sole evidence of defendant's repudiation of future performance must be gathered from the fact that at the time he removed some of the fir logs from the cold deck he told the plaintiffs he would refuse to deliver as many of these fir logs in the cold deck as he himself decided whether they liked it or not. His actions, coupled with the statements made, could be interpreted as referring only to his present performance. It cannot be interpreted as a present renunciation of all future performance under the contract. The refusal to deliver all of the logs from the cold deck could then constitute only a partial breach of the entire contract.

■ The question then remaining is—Was this partial breach such a material breach of the contract as to release the plaintiffs from their future contractual

duties and also permit their recovery of damages as for a total breach?

The problem is stated in 5 Williston on Contracts, 3715, (rev ed) § 1317, as follows:

"* * * As soon as a party to a contract breaks any promise he has made, he is liable to an action. In such an action the plaintiff will recover whatever damages the breach has caused. If the breach is a trifling one such damages cannot well be more than the direct injury caused by that trifling breach. But if the breach is serious or is accompanied by repudiation of the whole contract, it may and frequently will involve as a consequence that all the rest of the contract will not be carried out. This may be a necessary consequence of the situation of affairs or it may result simply from the plaintiff's right to decline to let the defendant continue performance, since even if all the remaining performances were properly rendered, the plaintiff would not get substantially what he bargained for. The plaintiff is entitled to damages which will compensate him for all the consequences which naturally follow the breach, and, therefore, to damages for the loss of the entire contract. * * *"

Assuming the contract is one for delivery of logs in installments and the breach consisted of the refusal to deliver an installment of logs, whether or not a breach of an installment contract is material and substantial is usually a question of fact and is dependent upon the circumstances surrounding the inception and execution of the particular contract. *Benedict v. Harris*, 158 Or 613, 77 P2d 442. In this case we quoted with approval, p. 618, the following statement of Mr. Justice Cardozo, taken from *Helgar Corporation v. Warner's Features*, 222 NY 449, 119 NE 113:

" 'Default in respect of one instalment, though falling short of repudiation may, under some con-

ditions be so material that there should be an end to the obligation to keep the contract alive. Under other conditions, the default may be nothing but a technical omission to observe the letter of a promise. General statements about that, at law, time is always of the essence. For some purposes this is still true. The vendor who fails to receive payment of an instalment the very day that it is due, may sue at once for the price. But it does not follow that he may be equally precipitate in his election to declare the contract at an end. That depends upon the question whether the default is so substantial and important as in truth and in fairness to defeat the essential purpose of the parties. Whatever the rule may once have been, this is the test that is now prescribed by statute. The failure to make punctual payment may be material or trivial according to the circumstances. We must know the cause of the default, the length of the delay, the needs of the vendor, and the expectations of the vendee. If the default is the result of accident or misfortune, if there is a reasonable assurance that it will be promptly repaired, and if immediate payment is not necessary to enable the vendor to proceed with performance, there may be one conclusion. If the breach is willful, if there is no just ground to look for prompt reparation, if the delay has been substantial, or if the needs of the vendor are urgent so that continued performance is imperilled, in these and in other circumstances, there may be another conclusion. Sometimes the conclusion will follow from all the circumstances as an inference of law to be drawn by the judge; sometimes, as an inference of fact to be drawn by the jury.' "

In 1 Restatement, Contracts 402, § 275, "Rules for Determining Materiality of a Failure to Perform" are set forth as follows:

"In determining the materiality of a failure fully to perform a promise the following circumstances are influential:

"(a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

"(b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

"(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;

"(d) The greater or less hardship on the party failing to perform in terminating the contract;

"(e) The wilful, negligent or innocent behavior of the party failing to perform;

"(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract."

From the evidence set forth, the jury could conclude that, even though time was not of the essence of the contract insofar as the logging of the timber and its delivery to plaintiffs was concerned, there was, at the time of the breach, timber cut and available which, if delivered, would have permitted the plaintiffs to continue with the contract, but if withheld would destroy the plaintiffs' ability to proceed.

The evidence is susceptible of belief that circumstances surrounding plaintiffs' need to continue with the manufacture of the logs into lumber to successfully finance their operation were well-known to the defendant from the inception of the agreement, and that his purposeful breach of the contract was to force the plaintiffs to lose their mill and thus terminate the agreement. His act could then be found to be willfully wrongful, constituting a material breach that would as effectively deny the plaintiffs their bargain as if there had been a total repudiation by the defendant. The defendant's advice to the plaintiffs to breach

their contract of purchase by not making a payment upon the mill contract is susceptible of belief that the defendant wished to have the present agreement between the parties terminated by their loss of the mill. Whether or not these motives activated the acts of the defendant was a question for the jury to determine. We cannot, therefore, say as a matter of law that the breach was not material.

The defendant insists that even though there had been a breach of the contract committed by the defendant the trial court should have instructed the jury that the plaintiffs could not recover damages for the total breach "unless they held themselves in readiness to receive further logs and manufacture the same in accordance with the contract."

■ When a breach of contract is, in effect, a total breach, it is only necessary that a plaintiff show he has carried out his contractual promises insofar as the conduct of the defendant has permitted him to do. *Schucking v. Young*, 78 Or 483, 153 P 803.

■ Under the circumstances of this agreement, as known and understood between the parties, the defendant's actions were such as to foreclose further performance by the plaintiffs.

The defendant assigns as error the trial court's withdrawal of his defense of an accord and satisfaction. As previously stated herein, the plaintiffs had become indebted to the defendant in the sum of $1,244.30 by reason of moneys and credits advanced. On January 26, 1952, after the breach of the contract complained of, the plaintiffs went to the defendant and offered the defendant a pond saw motor, some chains and bars of the value of approximately $500. The defendant accepted the property offered and cancelled the indebtedness of $1,244.30.

Since this transaction occurred after the alleged breach of the contract and at a time when the plaintiffs knew that they had been damaged by the actions of the defendant, it is the defendant's contention that, although there was no discussion between the parties relative to the unliquidated damages arising out of the breach of the contract, that the law should imply there had been, in fact, a settlement of all of their claims, one against the other.

■ In *Brady v. Selberg,* 154 Or 477, 479, 60 P2d 1104, we approved the following statement in 1 CJ 529, Accord and Satisfaction § 16:

> " 'To constitute a valid accord and satisfaction it is also essential that what is given or agreed to be performed shall be offered as a satisfaction and extinction of the original demand; that the debtor shall intend it as a satisfaction of such obligation, and that such intention shall be made known to the creditor in some unmistakable manner. It is equally essential that the creditor shall have accepted it with the intention that it should operate as a satisfaction. Both the giving and the acceptance in satisfaction are essential elements, and if they be lacking there can be no accord and satisfaction. The intention of the parties, which is of course controlling, must be determined from all the circumstances attending the transaction.' "

From this statement, it is very apparent that there must be a complete meeting of the minds to constitute an accord with reference to the prior obligation or obligations to be satisfied.

■ The evidence of both parties clearly shows that the questions involved in this law suit were never discussed or considered at the time the indebtedness represented by the note was compromised, and for a court to imply a meeting of the minds on the settlement of the

obligations arising out of this litigation would be, in effect, the making of a new contract for the parties. No error was committed by the trial court in refusing to submit this defense to the jury.

■ The defendant also assigns as error the trial court's failure to sustain defendant's objection to the following question, asked of the plaintiff Gustafson:

"Q Did you ever make any request of Mr. Williams to give you a written agreement with respect to the sawmilling?

\* \* \* \* \*

"MR. WINSLOW: The question is irrelevant and immaterial.

\* \* \* \* \*

"THE COURT: I think I will let him answer. \* \* \*

\* \* \* \* \*

"THE WITNESS (Mr. Gustafson):—and Mr. Williams said he did not think it was necessary, that he trusted us and we trusted him, and he said, if you feel that way, the next time I am to my attorney in Taft I will have him draw one up; but he never got one drawn up.

"Q How many times did you request—
"A Five or six times."

The question asked and the answer given were wholly irrelevant and immaterial, and it was error for the trial court over the objections of the defendant to admit this testimony. We do not think, however, that it was so prejudicial as to justify a reversal of this cause.