Argued December 12, 1933; reversed January 16, 1934

# GRAY *v.* MITCHELL ET AL.

(28 P. (2d) 631)

520

W. C. *Van Emon,* of Klamath Falls, for appellants.

*Arthur W. Schaupp,* of Klamath Falls, for respondent.

BELT, J. Plaintiff commenced an action to recover against defendants upon a promissory note for $500, dated October 2, 1931, and due on or before May 12, 1932. The defendants answered admitting the execution of the note but denying that there was any sum due thereon. As a further and separate answer the defendants allege that the note in question was executed at the time they entered into a contract with plaintiff for the purchase of certain real property. The purchase price of the property which defendants agreed to buy from the plaintiff was $4,700. $50.00 was paid upon the execution of the agreement and the balance of the purchase price was, under the terms of the contract, to be paid at the Oregon Bank & Trust Company, Klamath Falls, Oregon, at the dates and in the amounts as follows: "$50.00 on the 12th day of each and every month from November, 1931 to May, 1932, both inclusive; said payments to be applied first to payment of interest at the rate of 8 per cent per annum on deferred balances, and the balance upon the principal; on May 12, 1932 an additional payment of $500.00; thereafter, $43.00 on the 12th day of each

and every month, beginning June 12, 1932 and until the full purchase price has been paid; all such payments to be applied first upon interest at the rate of 8 per cent per annum, and the balance upon the principal sum due hereunder." The contract further provided: "But in case the second party shall fail to make the payments aforesaid, or any of them punctually and upon the strict terms and within 30 days of the times above specified, the time of payment being declared to be the essence of this agreement, then the first party (vendor) shall have the right to declare this agreement null and void; and in such case all the right and interest hereby created or then existing in favor of the second party derived under this agreement shall utterly cease and determine, and the premises aforesaid shall revert and revest in the first party without any declaration or forfeiture or act of re-entry, or without any other act by the first party to be performed and without any right of the second party of reclamation or compensation for money paid or for improvements made, as absolutely, fully and perfectly as if this agreement had never been made." Defendants allege in substance that, pursuant to the terms of the contract, they made ten monthly payments of $50.00 each, but defaulted in making payment of $500 due May 12, 1932, which indebtedness they allege is evidenced by the promissory note set forth in the complaint. Defendants further allege that, after default in such payment, they vacated the property which they contracted to purchase and surrendered possession of the same to the plaintiff. Defendants further allege in effect that, by reason of the rescission of the contract and the re-entry of the premises by the plaintiff, the promissory note which is the basis of plaintiff's action is without consideration and, therefore, null and void.

Plaintiff, in her reply, admits that the note for $500 represents a part of the purchase price of the property sold, but denies the allegations of the defendants with reference to the rescission of the contract and avers affirmatively that defendants, after the note was due, voluntarily surrendered possession of the premises.

The cause was tried in the lower court, with the consent of the parties, as a proceeding in equity. Judgment was rendered in favor of plaintiff for the amount due upon the note. From this judgment the defendants appeal.

When the defendants were unable to make the payment of $500 as specified in the contract, the plaintiff was advised by them of their intention to abandon the contract. Mr. Mitchell testified:

"Mr. Gray and I talked about this note at the time it was due in May and it was extended, as I say, and as I believe until September. At that time I had a slash in salary that made it impossible for me to meet these payments—meet the note, and I talked to Mr. Gray about giving it up and he advised me to keep it up and I said: 'All right, I will do everything possible to raise the money.' I made every effort possible to raise the money and I could not; so after some time—it might have been September or might have been October; I cannot remember the month—but I went to Mr. Gray and I told Mr. Gray I could not pay and I told him what redress he did have; maybe he could bring a suit, all right, but I told him I was going to vacate the house and move out. He said 'All right.' I do not know whether that was in August or September—I cannot remember; but, anyway, it went on until I think the 11th day of November that I did vacate the house; that is, I moved out and some few days later, perhaps a week or ten days; I don't remember which, I went to Mr. Gray's house and Mrs. Gray—I think it was; I'm sure it was Mrs. Gray—came to the door and I asked her where Mr. Gray was and she told me—I cannot remember where she told me, but I think he

was down at some lumber yard or some place, doing some work. She said: 'What do you want to see Mr. Gray for?' I said: 'I want to turn the keys over to the house.' She said: 'That is all right; just turn them over to me.' I said 'Thank you; that will save me the trouble of looking Mr. Gray up.' So I turned the keys over to whatever lady that came to the door, and I thought it was Mrs. Gray.

"Q. Now at the time you talked to Mr. Gray about giving up the house because you could not meet that note, and could not meet the payments, he said 'All right' did he?

"A. He said 'All right,' that night, that I had the last conversation I ever had with Mr. Gray."

Mr. Gray, the admitted agent of the plaintiff, who transacted the business in question, thus testified relative to the above conversation:

"Mr. Mitchell brought the keys to me one evening and gave me the keys and when he gave me the keys he said: 'Do the best you can,' and that is all the remark that was ever made that evening. I took the keys on account of we always—well, in a contract under sale we have to see the places are locked and the plumbing drained in all houses."

Mr. Gray also testified that about two weeks previous the following conversation had taken place between them:

" 'Mr. Gray, I cannot pay the note;' he said, 'I told you I would pay in September.' And I said: 'Well, Mr. Mitchell, catch up on your monthly payments and we will work the note out.' I said: 'We will cut the monthly payments and pay a little on the note.' I said that I had obligations I had made to offset that note and I would do everything in the world. He said: 'I would like to turn the place back to you.' I said: 'Mr. Mitchell, we have made obligations, to meet that note you gave us and we really cannot take the place back now.' That was the only conversation we ever had. Mr. Mitchell said 'All right, if you feel that way about it we will work it out some way'."

There is no dispute about the acceptance of the keys by the plaintiff or her husband. It is also admitted that after the defendants vacated the premises the plaintiff had the water and lights turned off. In answer to the question: "Now you took possession of the property when he turned over the keys?" Mr. Gray testified: "We could not take possession. We went over and locked it up; there is where you are mistaken. He only turned over two keys to us. There were three outside doors." Mrs. Gray testified that her husband accepted the keys "on the condition he wanted to go and see if the house was locked up and drain the plumbing so that it would not freeze up." This explanation is not convincing. We are not unmindful of the fact that, when the vendees vacated the property and tendered the keys to the plaintiff, the latter was placed in a precarious position in view of the small down payment exacted upon execution of the contract. It is natural that the vendor should desire to protect the property after the abandonment of the same by the vendees. Nevertheless, it was incumbent upon her either to insist upon performance of the contract or to disaffirm the same. At any rate, if the contract was an improvident one, it was one of her own making and she cannot avoid the effect of conduct on her part inconsistent with the theory of an affirmance of the contract.

There are affidavits to the effect that, while the appeal was pending in this court, the plaintiff rented the premises in question, but this is a matter de hors the record and can not be considered in determining whether the judgment of the lower court should be reversed and set aside.

When the defendants declared their intention to abandon the contract and vacated the premises, it

was incumbent upon the vendor either to affirm or disaffirm the contract. If the vendor elected to declare a forfeiture of the rights of the vendee in the contract, she could not thereafter assume an inconsistent attitude by insisting upon a performance of its terms. When the plaintiff or her husband accepted the keys and thereafter exercised dominion and ownership over the property in question, such conduct was in effect a concurrence in the rescission of the contract. A mutual rescission may be established by the conduct of the parties, as well as by an explicit agreement.

▉ We think it is established by the preponderance of the evidence that the vendor took possession of the property. The effect of such re-entry was to declare a forfeiture of the interests of the defendants therein. Having thus declared a forfeiture, it follows, as a matter of law, that there can be no recovery of overdue instalments on the purchase price: *Ward v. Warren,* 44 Or. 102 (74 P. 482). See numerous authorities in note 30 A. L. R. 631. *Walker v. Hewitt,* 109 Or. 366 (220 P. 147, 35 A. L. R. 100), is not to the contrary.

▉ When the defendants defaulted in payment and renounced the contract, the vendor impliedly consented to such rescission of the contract by taking possession of the property and exercising dominion over it. Such rescission or termination of the contract had the effect of destroying the consideration for the note which was given not as payment but as evidence of a payment to be made under the terms of the contract. As stated in *Ward v. Warren,* supra:

"The rescission also operates as a failure of consideration for the unpaid purchase money, and the vendor, in exercising his right to cancel and rescind the contract, relinquishes his right thereto."

. The rule is thus stated in 27 R. C. L. 666:

"If the vendor exercises his option to declare the contract at an end, he cannot change his position and thereafter hold the purchaser liable to complete the purchase or pay any part of the unpaid purchase money. The remedy of the vendor by way of a cancellation of the contract and the continued liability of the purchaser for the purchase money are totally inconsistent, and the exercise of the former terminates any further liability of the purchaser for the purchase money. This is true as regards the liability of the purchaser for unpaid instalments of the purchase money overdue at the time of the vendor's election to terminate the contract; and even though a judgment has been recovered against the purchaser for overdue unpaid purchase money, the subsequent termination of the contract by the vendor will relieve the purchaser from liability on the judgment."

■ As a general rule where there is a mutual rescission of a contract the vendee is entitled to recover the amount paid on the purchase price, but, in the instant case, the contract specifically provides that, in the event of a forfeiture, the vendee has no right "of reclamation or compensation for money paid or for improvements made, as absolutely, fully and perfectly as if this agreement had never been made." Hence, under the terms of this contract the defendants are not entitled to a recovery of the money paid on the purchase price nor are they to be compensated for improvements amounting approximately to $200. The note in question was not accepted as a down payment as contended by the plaintiff. If it had been accepted as such, the amount thereof should have been credited on the contract. It was not so done. Neither do we think that this note was intended as an independent covenant. Although the note was a separate instrument, it was

an integral part of the contract of purchase. The instant case is unlike that of *Walker v. Hewitt,* supra, where the note in question was given to cover the entire purchase price.

■ While the answer of the defendants is subject to criticism in that it alleges various conclusions of law, we think sufficient facts are alleged to show failure of consideration and a mutual rescission of the contract.

It would be manifestly unjust for plaintiff to rescind the contract by recovering possession of the property under the forfeiture clause, retain the instalments paid by the vendees, and recover the balance due on the purchase price.

The judgment of the lower court is reversed and the cause remanded with directions to enter a decree in accordance with the prayer of defendants' answer and not inconsistent with this opinion. Neither party will recover costs or disbursements.

RAND, C. J., BEAN and ROSSMAN, JJ., concur.