Argued October 28, 1958, reargued October 29, 1958, affirmed as modified December 10, 1958, petition for rehearing denied March 4, 1959

MORRISON ET AL *v.* KANDLER ET UX

334 P. 2d 459

*Harold Banta,* Baker, argued the cause for appellants. On the briefs were Vernon Daniel, Payette, Idaho, and Banta, Silven & Horton, Baker.

*W. F. Schroeder,* Vale, and *M. P. Gallagher,* Ontario, argued the cause for respondents. On the brief were Lytle & Schroeder, Vale, and Gallagher & Gallagher, Ontario.

Before PERRY, Chief Justice, and WARNER, McALLISTER, SLOAN and O'CONNELL, Justices.

AFFIRMED AS MODIFIED.

McALLISTER, J.

This is a suit in equity by the plaintiffs, as vendors, for the strict foreclosure of a contract for the sale of real and personal property. The defendants, as purchasers, filed a cross-complaint to rescind the contract and to recover the amounts paid on the purchase price. From a decree in favor of plaintiffs, the defendants appeal.

By a contract dated February 2, 1952, the plaintiffs, Harrison M. Morrison and Esther L. Morrison, his wife, agreed to sell to the defendants, Floyd Kandler and Minnie Kandler, his wife, a ranch containing

about 170 acres, together with 211 sheep and certain farm machinery. The ranch is located in the Westfall valley of Malheur county.

The purchase price for all the real and personal property was the sum of $51,500, which defendants agreed to pay as follows:

> (a) $3,500 in cash upon the execution of the agreement;
> (b) $12,000 by conveying to plaintiffs a 40 acre tract of land owned by defendants;
> (c) $7,000 by assuming and agreeing to pay the balance of a debt due the State Land Board and secured by a mortgage on plaintiffs' ranch; and
> (d) $2,580 on February 1, 1953 and a like sum annually thereafter until the full purchase price, together with the interest thereon, was paid.

The defendants took possession of the real and personal property at about the time the contract was executed.

On June 10, 1952, the Morrisons assigned to Harley E. Noah and Lulu B. Noah the first $19,000 to be paid thereafter by defendants under the contract of sale. This assignment was given to secure the payment of an indebtedness due to the Noahs by the Morrisons. Because of this assignment, Harley E. Noah and his wife joined as plaintiffs in this suit. Since this controversy is primarily between the Morrisons as vendors and the defendants as purchasers, we will refer to the Morrisons as the plaintiffs and when necessary, refer to the Noahs by name.

The ranch in question was irrigated and used primarily for the production of alfalfa hay. The flock of sheep was referred to during the trial as a "farm flock" and was apparently of secondary importance in the farming operation.

The controversy between plaintiffs and defendants which culminated in this suit began in the fall of 1953. During the latter part of November, 1953, Morrison visited the ranch on two occasions and objected to the Kandlers' conduct in disposing of some of the farm equipment without Morrison's consent. The equipment being purchased under the contract included a Model A John Deere tractor. In January, 1953 Kandler had traded this tractor to an equipment dealer as part of the down-payment for an International Super C tractor and other equipment. The Super C tractor and the other equipment was purchased by Kandler under a contract by which title was retained by the seller to secure the payment of the balance of the purchase price in the sum of $1,550.

During 1953, Kandler also traded, sold or attempted to dispose of a hydro loader, a cover crop disk, a Model D John Deere tractor, a grain drill, a manure spreader and a tractor mower. The proceeds from the sale of three of these items were paid to the escrow agent and applied on the contract. The remaining three items were recovered and returned to the ranch by Kandler after Morrison's visits in November.

Since the disposal of this farm machinery by Kandler is not decisive of this case, it is not necessary to go into further detail. Defendants contended that they were authorized to dispose of this machinery by a provision of the contract permitting them to replace unuseable equipment and claimed that the assignee, Harley Noah, had expressly approved some of the transactions.

On December 29, 1953, Morrison went to the ranch accompanied by W. F. Schroeder, one of his attorneys. These men inspected the ranch, the sheep and the farm equipment. The Kandlers were not at home but after

inspecting the property Morrison and his attorney prepared and left with one of the Kandler children the following notice:

"
                                    12-29-53
                                    11:40 a.m.
Floyd and Mrs. Kandler

By reason of your defaults under Morrison contract, 2 Feb 1952, among them and particularly in relation to absence of:

Model A John Deer tractor No. A2468R
Model D    "        "      "   No. D914R/B
Hydro Loader
Cover Crop Disk
2 Tractor Hay Bucks
1 John Deere Grain Drill & attachment
1 Manure Spreader
1 Track Harrow
2 Swathers
1 Tractor Mower

permitting tax lien on real and personal property and bad husbandry, we herewith take possession of the real and personal property involved in, and pursuant to said contract. A keeper, Mr. Lee Slabaugh to assume the lambing operation tomorrow.

s/H. M. Morrison
s/Lytle, Kilpatrick and Schroeder
by W. F. Schroeder            "

Pursuant to this notice Mr. Morrison returned to the ranch the following day accompanied by Lee Slabaugh. Morrison intended to take possession of the real and personal property and leave Slabaugh to care for the sheep which were then beginning to lamb. Again, the Kandlers were not at home but the Kandler children, in emphatic language, ordered Morrison and Slabaugh to "get off" the ranch and the two men got. Morrison made no further effort to obtain pos-

session of the property and the Kandlers remained on the ranch.

The next significant step in this controversy was the filing of this suit on January 5, 1954 and the service of a summons on both defendants on that same day. Plaintiffs' complaint alleged the execution of the contract and further alleged that the defendants had failed to comply with the contract in the following particulars:

(1) in selling or otherwise disposing of certain items of the farm machinery;

(2) in failing to pay to the State Land Board the payment due October 1, 1953;

(3) in failing to pay the taxes on the real and personal property;

(4) in failing to properly care for the sheep; and,

(5) in failing to properly care for and maintain the real property and the buildings thereon.

The complaint taken as a whole recognized the right of the defendants to remain in possession of both the real and personal property during the pendency of the suit unless otherwise ordered by the court. It alleged that the sheep were not receiving proper care and asked for the appointment of a receiver to care for them. The complaint concluded with a prayer for the strict foreclosure of the contract and the restitution of the real property if the amounts found due the plaintiffs were not paid within the time fixed by the court. Plaintiffs did not press their request for the appointment of a receiver to take charge of the sheep and no receiver was appointed.

After this suit was filed the Kandlers, acting on the advice of their attorney, took prompt action to remedy the alleged defaults. On January 6, 1954, they

paid the first quarter of the taxes on the real and personal property for the fiscal year 1953-54. At the same time defendants paid some real property taxes for the fiscal year 1952-53 amounting to $10.65 which apparently had been overlooked the year before. On January 7, the defendants paid the delinquent installment due the State Land Board and paid to the escrow agent the proceeds received from the sale of the tractor mower in the sum of $110.

The next decisive step in this controversy was taken by defendants. On the evening of January 13, 1954, again acting on the advice of their attorney, the defendants, accompanied by two friends to serve as witnesses, called on plaintiffs at Durkee. The Kandler car was parked in front of plaintiffs' home and Morrison was persuaded to come out to the car where he and Kandler engaged in a conversation.

In substance, Kandler said that Morrison had broken the contract, that the Kandlers were moving off the property and wanted their money back. Kandler did not say how the contract was broken although Morrison questioned him about it several times. Kandler said "We are declaring the contract ended. You take possession immediately." Morrison said "Alright if that is the way you feel—I don't see how I broke the contract. I will have a man there by noon tomorrow." Morrison was informed that there was very little hay on the ranch to feed the sheep and that he would have to buy some feed. As a witness, Kandler was asked why he did not tell Morrison how the contract had been broken. Kandler replied "I didn't know; I am going to be frank with you; I didn't know."

On the following day, January 14, 1954, the Kandlers voluntarily vacated the property and plain-

tiffs took possession and started caring for the sheep. The plaintiffs have been in possession of the property since that date.

On January 14, 1954, the defendants filed their answer and cross-complaint in this suit. By their answer, defendants denied that they were in default in the performance of the contract and alleged that all of the defaults charged had been cured within the 60 day period of grace allowed by the contract. In their cross-complaint, defendants alleged that plaintiffs had repudiated the contract by serving the Kandlers with the notice quoted above and by attempting to take possession of the premises on December 29, 1953. Defendants further alleged that they had acquiesced in said repudiation of the contract by plaintiffs and thereby had rescinded the contract. Defendants demanded a return of the sums paid on the contract totaling $19,735 and attorney's fees in the sum of $2,000.

On December 13, 1954 the defendants filed an amended and supplemental answer and cross-complaint. Defendants alleged an additional ground for rescission of the contract based on the conduct of plaintiffs during the pendency of this suit, as follows:

"That regardless of whether defendants' rescission, as set out in their first defense and counterclaim was justified or not at the time it was undertaken, the plaintiffs have, since that time and during the pendency of this suit, acquiesced therein, have dealt with the said real and personal property covered by said contract as their own and in so doing, have put it beyond their power to carry out and perform the said contract on their own part, in the following particulars.

"That as hereinbefore alleged, the plaintiffs have taken possession of the real and personal

property covered by said contract and after securing possession thereof, the said plaintiffs have in all respects dealt with and treated said property as their own. Plaintiffs have sold and disposed of all of the sheep included in said contract and have also, as defendants are informed and believe, sold and disposed of various of the farm machinery and equipment. Plaintiffs have removed various of the fences and otherwise altered the improvements and changed the condition and method of operation of said real property to suit their own convenience and wishes and have otherwise dealt with the same in all respects as though they were the sole owners thereof and wholly without regard to the wishes of the defendants or their rights under such contract."

As an additional affirmative defense defendants took an equivocal position by alleging that even if they were not entitled to rescind, nevertheless, plaintiffs were not entitled to a strict foreclosure of the contract; that defendants should be restored to possession of the real property and allowed to continue performance of the contract. Except for these allegations in their amended answer and cross-complaint, the defendants, after they surrendered possession of the property to plaintiffs, made no effort to resume possession and made no objection to the manner in which the property was being operated by plaintiffs. They took no further interest in the property except to defend this suit and prosecute their cross-complaint for rescission.

Having outlined in chronological sequence the successive steps taken by the parties to this controversy, we will now refer to the rules of law which control our decision.

■■ Defendants rely primarily on the well established rule that if a vendor wrongfully attempts to de-

clare a forfeiture of a contract of sale, the purchaser may treat such action as a repudiation of the contract by the vendor and may elect to rescind the contract. This court has uniformly held that the vendee may acquiesce in a wrongful repudiation of the contract by the vendor and thereby effect a mutual rescission of the contract. *Macomber v. Waxbom,* 213 Or 412, 325 P2d 253; *Zumstein v. Stockton et ux.,* 199 Or 633, 641, 264 P2d 455; *Grider v. Turnbow,* 162 Or 622, 640, 94 P2d 285; *Holland v. Bradley,* 140 Or 258, 264, 12 P2d 1100; *Johnson et al. v. Berns et al.,* 111 Or 165, 209 P 94, 224 P 624, 225 P 727; *Epplett v. Empire Inv. Co., Inc.,* 99 Or 533, 544, 194 P 461, 700; and *Cornely v. Campbell,* 95 Or 345, 186 P 563.

Defendants contend that plaintiffs' attempt, on December 29, 1953, to declare a forfeiture and take possession of the real and personal property was wrongful because defendants were not in default and because in any event, the declaration of forfeiture, being attempted without prior notice, was premature.

■ The contract of sale involved in this case merely gave the vendor, upon default by the purchaser, an option to declare a forfeiture. It has been repeatedly held by this court that a contract which, upon default by the purchaser, gives the vendor only an option to declare a forfeiture is not self-executing. Under such a contract the vendor may declare a forfeiture only after (1) he has given notice of his intention for a reasonable period of time and (2) the purchaser has failed to cure the default during the time fixed by such notice. A notice declaring that a forfeiture is then effected rather than stating that a forfeiture will be effected in the future unless payment is made within a prescribed time is a breach of the implied stipulation to give reasonable notice and does not

effect a forfeiture. *Howard v. Jackson,* 213 Or 447, 324 P2d 757; *Zumstein v. Stockton et ux.,* supra; *Grider v. Turnbow,* supra; *Epplett v. Empire Inv. Co., Inc.,* supra; *Kemmerer v. Title & Trust Co.,* 90 Or 137, 175 P 865; and *Higinbotham v. Frock,* 48 Or 129, 83 P 536.

If, as contended by the defendants, the attempt by plaintiffs to declare a forfeiture and take possession of the property on December 29, 1953, was wrongful, it would follow as a matter of course that defendants had the right to treat such action as a repudiation of the contract by plaintiffs and elect to rescind the contract. Defendants, however, whether wisely or not, did not promptly elect to rescind the contract but on the contrary, continued in possession and engaged themselves diligently in the performance of the contract.

It will be noted that defendants, with full knowledge of the alleged wrongful conduct of the plaintiffs, remained in possession of the property, continued to treat the contract as in force and attempted to cure any alleged defect in their prior performance of it. Whether this conduct constituted a waiver by defendants of their right to rescind is a question which need not be decided now. See *James v. Ward,* 96 Or 667, 190 P 1105. In any event, before defendants indicated an intent to rescind because of plaintiff's alleged wrongful declaration of forfeiture, defendants' right to rescind was extinguished by the filing of this suit.

■ A suit for strict foreclosure recognizes that the contract is presently in effect and seeks to enforce it. It is an affirmance of the contract. *Howard v. Jackson,* supra; *Zumstein v. Stockton et ux.,* supra; *Nielsen v. Baldridge,* 173 Or 555, 146 P2d 754; *Grider v. Turn-*

*bow,* supra; *McCracken v. Walnut Park Garage, Inc.,* 156 Or 697, 68 P2d 123; and *Flanagan v. Great Cent. Land Co.,* 45 Or 335, 77 P 485. The rule is now well established that the filing of a suit for strict foreclosure is a waiver by the vendor of any right to forfeiture. In *Zumstein v. Stockton,* supra, the court said:

"* * * The fact that a vendor has declared a forfeiture, or that a forfeiture has automatically occurred, does not prevent the vendor from suing for strict foreclosure. The forfeiture is waived when the plaintiff seeks strict foreclosure."

In *Grider v. Turnbow,* supra, the court held that a vendor who had repudiated the contract by wrongfully declaring a forfeiture had a "right to recede from that position" prior to the making by purchaser of any claim of a rescission or cancellation of the contract based on vendor's action.

In *Dorsey et ux. v. Tisby et ux.,* 192 Or 163, 180, 234 P2d 557, the purchaser contended that the action of the vendor in declaring the contract forfeited terminated the agreement and precluded the vendor from later bringing his suit for strict foreclosure. The court said:

"* * * It appears to us as not illogical to say that when the plaintiffs filed this suit [for strict foreclosure] they withdrew their notice of forfeiture and reinstated the contract."

See also *Hodges et ux. v. Servine et ux.,* 211 Or 428, 316 P2d 312.

■ It is also well settled that when the purchaser is given possession under the contract the bringing of a suit for strict foreclosure is an admission by the vendor that the purchaser is entitled to remain in possession until barred finally by the decree of the court. *Macomber v. Waxbom,* supra; *City of Reeds-*

*port v. Hubbard et ux.,* 202 Or 370, 274 P2d 248; and *Grider v. Turnbow,* supra.

After this suit was filed, the purchasers were entitled to remain in possession of the property and were assured of the full protection of their rights by the court. If the suit for strict foreclosure was prematurely brought, defendants were entitled to have the suit abated or dismissed. *Hodges et ux. v. Servine et ux.,* supra; *City of Reedsport v. Hubbard et ux.,* supra; *Zumstein v. Stockton et ux.,* supra; and *Grider v. Turnbow,* supra. However, instead of relying on the court to protect their rights defendants embarked on a course of self-help with apparent unfortunate results.

After the plaintiffs had affirmed the contract by bringing this suit, no action was taken by them giving the defendants any right to rescind the contract. For the first few days after suit was filed, defendants were busily engaged in curing the alleged defaults specified in plaintiffs' complaint. Then on January 13, 1954, after their right to rescind had been extinguished by the filing of this suit, defendants belatedly attempted to rescind the contract based solely on the alleged wrongful conduct of the vendors on December 29, 1953.

■ When the defendants on January 13, 1954, voluntarily surrendered possession of the property to plaintiffs and refused to further perform the contract, they acted at their peril. If defendants were acquiescing in a prior wrongful repudiation of the contract by the vendors, their conduct constituted an approved method of effecting a mutual rescission of the contract. See *Zumstein v. Stockton,* supra, and other cases cited supra. But if defendants were acting without sufficient cause, their conduct amounted to an unequivocal breach and repudiation of the contract by them. In

this case defendants concede that they relied solely on the allegedly wrongful attempt of the plaintiffs to declare a forfeiture on December 29, 1953. As we have pointed out, this cause for rescission was extinguished when plaintiffs filed this suit for strict foreclosure.

The general rules applying to an anticipatory breach of an executory contract are stated in *Swick v. Mueller et ux.,* 193 Or 668, 238 P2d 717. See also *Weaver et al. v. Williams,* 211 Or 668, 317 P2d 1108 and *Dibble v. Hodes Co.,* 132 Or 596, 277 P 820, 286 P 554. In this case defendants' repudiation of the contract was acted upon by plaintiffs when they resumed possession of the property. Under the facts of this case they could hardly have done otherwise. As pointed out in *Dibble v. Hodes Co.,* supra, several remedies are available to a party to an executory contract which has been repudiated by the other party. In this case the plaintiffs elected to continue the prosecution of their suit for strict foreclosure. It is therefore unnecessary to consider what other remedies were available to them.

There is no evidence in this case tending to prove that plaintiffs intended to effect a rescission of the contract when they retook possession of the property. On this phase of the case defendants rely on the conduct of the plaintiffs after they had resumed possession.

■ We must therefore next consider whether the conduct of plaintiffs after they resumed possession of the property effected any change in the rights of the parties. We believe it did not. In the first place, there is no evidence that plaintiffs, after they resumed possession of the property, took any action which would prevent them from fully performing the contract. No evidence was offered to prove or attempt to prove to

what extent, if any, defendants would be damaged or even seriously inconvenienced by any action taken by plaintiffs in connection with the real and personal property.

The plaintiffs cared for the sheep until August 2, 1954 and then sold them through a local livestock marketing agency. The market value of the sheep both when they were surrendered to plaintiffs and when they were sold by plaintiffs was readily ascertainable. The sheep were white-faced ewes common to the country and easily replaced. In fact, defendants had replaced a substantial number of the ewes purchased from plaintiffs with others of like kind. Not a scintilla of evidence was offered to prove that the rights of the defendants were in any way impaired by the sale of the sheep. In fact, very little evidence about the value of the sheep was offered by either party. Kandler testified as to their value when he surrendered them to plaintiffs and Morrison testified as to the amount received for the sheep when he sold them. We have examined with care the more than 700 pages of testimony, much of which has little bearing on the issues in this case. Viewing the testimony as a whole, it is obvious that the parties attach no significance to the sale of the sheep from a practical standpoint. Their value could be readily ascertained and accounted for by plaintiffs. The defendants, if they redeemed the property, could readily replace all or any part of the sheep with others of like kind and quality.

Defendants also alleged that plaintiffs "sold and disposed of various of the farm machinery and equipment." The only items of the equipment disposed of by plaintiffs after they resumed possession was the Model D John Deere tractor and a hay chopper. The

Model D tractor had been in only fair shape when it was sold to Kandler and had been used by Mr. Morrison primarily for chopping hay. Kandler apparently had no use for it and sold it in 1953. It was not paid for and after Morrison's visit to the ranch in November, 1953, Kandler repossessed the tractor and returned it to the ranch. According to Morrison, the clutch of the tractor was wrecked and the steering wheel was missing. This testimony was not disputed by Kandler. Morrison traded this Model D tractor and the hay chopper to get a bigger tractor "to stack hay with." The defendants' indifference to the disposal of these two items by plaintiffs is clearly indicated by the complete lack of testimony concerning the value or usefulness of this equipment. The evidence indicates that these items were of comparatively nominal value and easily replaceable.

The same situation exists with regard to the claim that plaintiffs changed the fences. Defendants had installed an electrical fence of undisclosed value or dimensions to keep stock off the banks of the irrigation ditch. Morrison testified that he had rolled up and put away the electrical fence, one cross fence and some temporary fencing installed by Kandler. Defendants offered no evidence to prove the quality, quantity or value of this fencing or the cost of replacing it. Kandler testified that the cost of all of the fencing material installed on the property by him was about $300. What portion of this fencing was rolled up and put away by Morrison is not disclosed. No evidence was offered to show how or to what extent, if any, defendants would be damaged or even inconvenienced by the changes in the fences if they redeemed the property and resumed possession.

The charge that plaintiffs "changed the condition

and method of operation of said real property" is also without substance. During the entire period of this controversy the bulk of this property has been used to raise hay. About 130 acres were planted in alfalfa and about 20 acres in pasture. No significant changes in this arrangement were made by Kandler and none have been made since by plaintiffs. Morrison replanted 45 acres of alfalfa which he claimed had been killed by overpasturing and flooding while Kandler was in possession. Again, no evidence was offered to show any change in the condition of the property since it was turned back to plaintiffs nor how the rights of defendants would be impaired if they redeemed the property and resumed possession.

In short, the charge in the cross-complaint and the defendants' brief that plaintiffs have put it beyond their power to carry out and perform the contract is a technical defense not supported by the evidence. This is demonstrated quite clearly by defendants' cross-complaint. Both in their original and in their amended cross-complaint defendants asked that they be restored to possession and be allowed to perform the contract if their claim of rescission is denied. This is clearly inconsistent with defendants' claim that performance of the contract has been rendered impossible by the conduct of plaintiffs after they resumed possession.

■ In the second place, when a purchaser without sufficient cause repudiates a contract of sale and voluntarily surrenders the property, a vendor who has resumed possession and elected to sue for strict foreclosure is given a reasonable latitude in operating the property pending the final determination of his suit. To hold otherwise would put a premium on the conduct of a purchaser who refuses to perform his

contract and vacates the property. The reason why such conduct has not been approved by the courts is clearly stated in the early case of *Rounds v. Baxter*, 4 Greenl. (4 Me.) 454, as follows:

> "It is a proverbial principle that a man is not permitted, in a court of justice, to take advantage of his own wrong or neglect. The principle is founded in the highest reason. If a man, after he has made a fair contract, and partially fulfilled it, may, without the consent, or any fault, on the part of him with whom he has contracted, rescind the agreement, excuse himself at once from all further concern about it, and recover back whatever he has paid, he may speculate and disappoint and injure his neighbor whenever his interest or his passions may dictate, and thus triumph over him in security, and enjoy himself a complete indemnity. Justice will not sanction such a proceeding. The cases in which one of the parties to a contract may lawfully disaffirm and rescind it are those in which the other party has been in fault, or where, by the terms of the contract, a right to rescind it is reserved."

The above statement from *Rounds v. Baxter* was quoted by the supreme court of Washington in *Van Keulen v. Sealander*, 183 Wash 634, 49 P2d 19, a case similar in many respects to the case at bar. See also *Roethemeyer v. Milton*, 187 Wash 582, 60 P2d 694.

In *Schuler et ux. v. Humphrey et ux.*, 198 Or 458, 257 P2d 865, this court held that a purchaser who, pending determination by the court of his right to rescind, continued to operate a ranch for the benefit of the vendor was not restricted to mere preservation of the status quo. The court said:

> "In carrying on the ranch operations, plaintiffs were fully empowered to take all steps reasonably necessary to the conduct of the business. This in-

cluded the right to plant and raise crops and sell them, as well as the right to sell the livestock at the times it should be sold; in other words, plaintiffs had the right to carry on the business of the ranch for the benefit of defendants, as well as for their own protection, just as they might have been expected to carry it on were they the owners thereof."

We think the above rule must work both ways and applies equally well to a vendor who, to protect his security, is required to take back and operate a ranch pending a determination by the court of his right to strict foreclosure. A vendor, forced to take back and operate a ranch by the wrongful repudiation of a contract by the purchaser, should not at his own peril and expense be required to act as a mere keeper. In determining whether the vendors repudiated the contract after they resumed possession, the test is whether their conduct evinced an intention to no longer be bound by the contract. See *Cornely v. Campbell*, supra. From the evidence in this case it is apparent that the vendors have at all times been prepared to deliver the real property to defendants in substantially the same condition as when it was surrendered to them and to account for the reasonable rental value of the real property while in their possession and to also account for any personal property disposed of by them.

We think the lower court should have credited on the purchase price the market value of the sheep when they were surrendered to the plaintiffs instead of the amount for which the sheep were sold by plaintiffs in August 1954. Defendants are also entitled to credit for the reasonable value on January 14, 1954 of the Model D John Deere tractor and the hay chopper. Plaintiffs are chargeable for the reasonable rental value of the property during the pendency of this

appeal and are, of course, entitled to credit for any taxes or installments on the State Land Board mortgage that have been paid by them.

The case is remanded to the lower court with instructions to determine the amount due plaintiffs in accordance with this opinion and to enter a decree of strict foreclosure giving defendants six months within which to redeem the property.

Neither party is allowed costs and disbursements in this court.

PERRY, C. J., dissenting.

I am unable to concur in the result reached in the majority opinion.

I am in full accord with the conclusion that the defendants did not have a right to rely upon the plaintiffs' apparently wrongful declaration of forfeiture to effect a rescission of the contract after plaintiffs had withdrawn that declaration by filing their suit for a strict foreclosure. The commencement of a suit for a strict foreclosure recognized that defendants still retained an interest in the property and its maintenance would be inconsistent with a claim that there had been a forfeiture of all rights therein.

I cannot, however, agree with the majority conclusion that, after the suit for strict foreclosure was instituted, the plaintiffs did not by their actions assent to a mutual rescission of the contract of purchase.

Within a few days after plaintiffs commenced this suit, the defendants on January 13, 1954, went to the home of the plaintiffs' Morrison. Plaintiffs' own version of what occurred is as follows:

"A. I [Morrison] got in the car and set down, and he says, 'I'm going to turn it back to you.' He [Kandler] says, 'You broke the contract,' and I said, 'How did I break the contract?' I asked him

two or three times, and no tell me; he just set there. He says, 'I want my money. You broke the contract.' I never said anything about his money or nothing, only I said, 'Well, Mr. Kandler, I hate to see you lose it. I have done everything I can do for you, and I hate to see you lose it.' He says, 'You'll have to take the sheep over in the morning, and I have sold the hay, and I have given a few days' notice to somebody they could keep it, and there's no hay.' I said, 'Well, is there any hay?' and he said, 'Yes, I've got two men taking care of it.' His family had moved, I guess. So we borrowed hay the next night, or made arrangements."

While it is true the defendants had been sent by their attorney to the home of the plaintiffs', where this conversation occurred, and they did not know wherein the plaintiffs had breached the contract, whether by the premature declaration of forfeiture previously made, or for some other reason, it is clear they offered to return the property to the plaintiffs and demanded a return of their money. The plaintiffs' own account of this meeting discloses only an offer to rescind, accompanied by a tender of the property which was the subject of the contract, and a demand to be placed in statu quo. The plaintiffs on the following day went into possession of the property. While in possession of the property they lambed the ewes, sold and disposed of the lamb crop, sold the ewes, a portion of the farm machinery, and changed the operation of the farm by changing fences and operating cattle thereon.

It is immaterial whether the defendants at the time they made the offer to rescind had a legal right to do so or not, if in fact a rescission was effected. "If either party, without right, claims to rescind the contract, the other party need not object, and if he permits it to be rescinded, it will be done by mutual consent."

*Woodard v. Willamette Val. Irr. Etc. Co.*, 89 Or 10, 15, 173 P 262; 17 CJS 881, Contracts § 389.

Therefore, after the offer to rescind was made by the defendants, it is necessary to determine the legal rights of each of the parties.

There can be no question but that the plaintiffs had an election of rights. Even though the defendants had no legal right at that time to rescind, the plaintiffs were required to reject that offer or acquiesce therein. If plaintiffs rejected the offer, and the defendants left the property which was the subject of the contract, they could enter therein as keepers. If plaintiffs elected to accept the offer, then the contract was at an end and their full ownership of the property confirmed.

The defendants, in order to keep their tender of rescission intact, could either depart from the premises, as they did, or return thereto and operate the premises as keepers. *Schuler et ux. v. Humphrey et ux.*, 198 Or 458, 257 P2d 865, 27 ALR2d 14.

We are, therefore, concerned with what was done by the parties in view of their legal rights.

It must be kept in mind that throughout these proceedings the plaintiffs have maintained they have a right to a strict foreclosure of the contract, thus maintaining that defendants have an interest in the property until terminated by legal proceedings. Such relief was granted by the trial court, and could only have been granted on the basis that defendants had breached their contract.

I believe the majority fall into error when they say:

"We must next consider whether the conduct of plaintiffs after they resumed possession of the property effected any change in the rights of the parties. We believe it did not. In the first place,

there is no evidence that plaintiffs, after they resumed possession of the property, took any action which would prevent them from fully *performing the contract.* No evidence was offered to prove or attempt to prove to what extent, if any, defendants would be damaged or even *seriously inconvenienced* by any action taken by plaintiffs in connection with the real and personal property." (Italics mine)

The issue is not, did plaintiffs do some act that would prevent them from being able to fully perform or which in some way would damage or inconvenience the defendants if foreclosure was denied by the court? Such conclusions would be immaterial to the true issue except as the acts from which the conclusions may be drawn disclose an election to accept the offer of rescission.

The true issue is, did they by their actions elect to consent to defendants' offer of rescission?

Assent to rescission may be accomplished by acts as well as words. *Woodard v. Willamette Val. Irr. Etc., Co.,* supra.

Mr. Justice Holmes, speaking for the Court in *Wm. W. Bierce L'D v. Hutchins,* 205 US 340, 346, 27 S Ct 524, 51 L Ed 828, said:

"Election is simply what its name imports: a choice, shown by an overt act, between two inconsistent rights, either of which may be asserted at the will of the chooser alone."

It seems to me that an election to treat property as one's own is established by overt acts whenever it appears a seller, having only the equitable title to the property, and although having rights of a keeper, exercises control over the property inconsistent with the ownership of the purchaser. *Montgomery v. Heider,* 147 Or 523, 34 P2d 657; *Bodding v. Staehli et al.,* 146

Or 370, 30 P2d 3; *Gray v. Mitchell,* 145 Or 519, 28 P2d 631; *Kellogg v. Smith,* 70 Or 449, 142 P 330, and cases cited infra.

Under the facts of this case, I would think there could be no argument but that the plaintiffs could lawfully re-enter upon the premises, but this right would extend no further than the rights of a keeper or conservator. That this is the established law of this state there can be no question. This rule is clearly set forth by this court in *Kellogg v. Smith,* supra, and again re-affirmed in *Schuler et ux. v. Humphrey et ux.,* supra. While the former case deals with acquiescence in a judgment, the rule of law relative to consent or acquiescence which results in an election is the same. *Lewis et ux. v. Shook et ux.,* 182 Or 483, 188 P2d 148.

In the Kellogg case, Kellogg had brought a suit to cancel a deed to real property, a promissory note, and a chattel mortgage, due to the fraud of the vendor, Smith. The trial court cancelled the contract, returning Smith to the ownership of certain personal property and equipment used in the operation of a "wet-wash" laundry. Smith appealed. While the appeal was pending, Smith leased the building, machinery and equipment to a Mr. Perkins. This court dismissed the appeal for the reason that Smith had elected to acquiesce in the judgment. We said, p. 456:

> "It must be conceded that it was the right and duty of the defendant to protect and preserve the property described in the chattel mortgage, and, if his possession of the machinery, equipments, etc., had been limited to such care, the motion to dismiss the appeal would necessarily be denied. It appears, however, that his management of, and control over, such property extended far beyond its mere protection."

To the same effect is the case of *Fluhrer v. Bramel,* 158 Or 694, 72 P2d 47, 73 P2d 265, 77 P2d 824. In this case a suit was commenced to rescind a contract involving the purchase and sale of a service station. The trial court granted rescission and Bramel, the defendant, was decreed to again be the owner of the filling station. Bramel appealed. While this appeal was pending, the court, believing Bramel had leased the property for $35 per month for the purpose of obtaining money to maintain the property pending the outcome of the litigation, dismissed the appeal on the ground that Bramel had elected to acquiesce in the judgment entered by the trial court.

In *Gray v. Mitchell,* 145 Or 519, 28 P2d 631, the vendees, unable to make payment on the contract, executed a $500 note, payable to vendor. Also, being unable to pay this $500, vendees advised vendor of their intention to abandon the contract, and tendered the key to the premises to vendor who re-entered the land in question. Suit was brought to enforce payment of the $500 note. The court held that when the vendees declared their intention to "abandon the contract" and vacated, it was incumbent upon the vendor either to affirm or disaffirm the contract; that vendor's re-entry upon the land effected a forfeiture of the contract; that when the vendor exercised dominion and ownership over the property, such conduct was a concurrence in the "rescission of the contract." See, also, *Bodding v. Staehli et al.,* supra.

As previously pointed out, the plaintiffs in this case on going into possession, after the offer to rescind had been made, sold the farm flock of ewes, some of the machinery, changed the fences to care for cattle which they were going to and did run upon the premises. All of these acts of the plaintiffs' occurred

before the rights of the defendants' were determined or extinguished by any decree of the trial court, and at a time that the plaintiffs were admitting the defendants were the owners of the property.

To me it appears clear that such actions as a sale of a portion of the corpus of the security and changing the operation of the property solely for the benefit of the plaintiffs could be done under no other theory than that the contract had been terminated and they were the owners thereof.

The plaintiffs by their overt acts in exceeding their authority as conservators or keepers for security purposes, and acting for their own benefit, did elect to accept the offer of the defendants to rescind. I would, therefore, reverse the judgment of the trial court and direct a judgment of mutual rescission, placing the parties in statu quo.

Mr. Justice SLOAN joins in this dissent.