Phil E. TOVREA, Jr., Plaintiff,

v.

U. S. ALDERMAN, Defendant.

Civ. No. 61–195.

United States District Court
D. Oregon.

Nov. 16, 1962.

Ferris F. Boothe, of Black, Kendall & Tremaine, Portland, Or., for plaintiff.

Shuler, Sayre, Winfree & Rankin, Portland, Or., and Marsh, Marsh, Dashney & Cushing, McMinnville, Or., for defendant.

SOLOMON, Chief Judge.

Plaintiff seeks the return of $50,000 which he alleges he paid to defendant as a deposit on a contract for the purchase and exchange of real and personal property. Plaintiff asserts that the defendant breached and repudiated the contract and wrongfully declared a forfeiture of the deposit.

On July 2, 1959, defendant granted plaintiff an exclusive option to purchase defendant's Alderman Farms (Farms) for $2,641,000.00, payable $241,000.00 in cash, $650,000.00 in notes or securities, and the balance of $1,750,000.00 by the transfer of stock or assets of three Arizona corporations owned by the plaintiff. The option was to be exercised on or before September 1, 1959, at which time plaintiff was to pay defendant $50,-000.00 "as earnest money and in part

payment of the purchase or exchange." Plaintiff's property was in or near Phoenix, Arizona, and defendant's property was in Dayton, Oregon.

On September 19, 1959, plaintiff in a letter to defendant tendered $50,000 as "Earnest money deposit on purchase and exchange," but plaintiff added conditions not in the option agreement. He wanted a new closing date of February 1, 1960, and a provision that he need not make further payments until the Farms, with the assistance of defendant, was sold to third parties.

Defendant refused to accept the tendered check until October 9, 1959, when a new agreement was executed. The new agreement provided for a closing date of February 1, 1960, with the parties' attorneys to have fifteen days thereafter to conclude the transaction. It also provided that plaintiff was to pay defendant $200,000 prior to the closing date. Defendant agreed to provide plaintiff with reasonable assistance to acquire financing for the transaction. At plaintiff's request, the following provision, prepared by plaintiff's attorney, was included in the agreement:

> "In the event of a default by Tovrea in the consummation of this transaction, his liability shall be limited to the forfeiture of the Fifty Thousand Dollar ($50,000.00) down payment heretofore made to Alderman plus the payment of such additional damages as Alderman may have incurred on account of such default, not exceeding the additional sum of Two Hundred Thousand Dollars ($200,000.00)"

Prior to the execution of the agreement, the parties exchanged draft agreements. Defendant knew plaintiff was acquiring Alderman Farms for resale.

Plaintiff, with defendant's assistance, continued his efforts to finance the purchase and exchange. Defendant supplied plaintiff with information concerning the assets and operations of the Farms. In December, 1959, defendant gave plaintiff the earnings records even though he had already informed plaintiff that the poor earnings of the Farms would not help in the financing or sale of the properties. Nevertheless plaintiff listed the Farms for sale at $4,000,000. For that purpose, he prepared an elaborate brochure. The brochure, based on information supplied to plaintiff by defendant, selected only the attractive details of the Alderman Farms.

In order to obtain additional time to find a buyer, plaintiff attempted to increase the sizable mortgage on the Farms by a substantial amount. However, plaintiff sought to obligate only the defendant's Farms property. Plaintiff was unwilling to use any of his own assets or properties to make the $200,000 payment and to meet his other contractual obligations. The February 1 closing date passed without the deal being consummated.

Even though defendant was in need of the promised funds for the Spring season on the Farms, he granted plaintiff additional time to perform. Plaintiff was well aware of defendant's needs. A supplemental agreement dated April 8, 1960, fixed the date for determining book value of the properties transferred and provided further that the parties would take "the steps necessary for closing this deal * * * prior to May 1, 1960, although the attorneys shall have a reasonable time thereafter within which to work out adjustments, set up escrows, and record documents or do other acts necessary to carry out this agreement." The $200,000 payment on May 1, 1960, was to be paid from an additional mortgage on the Alderman Farms freezing plant, with that loan obligating plaintiff rather than defendant. Defendant had completed his inventories and title reports in readiness for the closing, but this closing date also passed without performance.

Plaintiff continued his efforts to arrange financing. On May 5th, plaintiff's appraisal of defendant's properties was completed, and a copy was furnished to defendant.

On June 24, 1960, Clyde Smith, plaintiff's trusted assistant, visited defendant and discussed plaintiff's difficulty in

completing performance. This meeting was followed by two more on June 27th. Smith was the vice-president of one of the Arizona corporations whose assets, listed at $1,750,000, were to be transferred to defendant, and secretary of two other Arizona corporations involved in the transaction. Smith participated in substantially all of the Oregon negotiations and did the major share of the work in attempting to arrange financing. Smith told defendant that plaintiff was unable to make the $200,000 payment or complete the transaction because his father refused to loan him the money and plaintiff was unable to raise it by any other means. Smith referred to plaintiff's pending divorce action in Arizona, a community property state, as one of the reasons for his inability to raise the money.

Smith also told defendant that the Arizona properties were not worth the value attributed to them and that the construction equipment which defendant was to receive was old, rusty and worn out. "I don't think you would want it anyway. Why not give Phil back his $50,000 and get him off your neck?", Smith told the defendant. He suggested that plaintiff would not insist upon cash and would probably take defendant's note for $50,000.

Shortly thereafter, defendant consulted Mr. Paul Sayre, his attorney, with respect to these conversations. Mr. Sayre, in a letter to plaintiff dated June 29, 1960, reviewed the various agreements by which plaintiff was granted additional extensions of time to perform, the steps taken by defendant to perform, the defendant's readiness to close the deal and the need to conclude the transaction in view of plaintiff's non-performance as of that date. The letter concluded: "All extensions of time for performance of the agreements upon your part, are hereby cancelled and Alderman will stand upon his rights under the written agreements." Two days later, Mr. James Powers, plaintiff's attorney, responded that plaintiff was continuing his attempt to arrange for financing but that he needed "more detailed information regarding the earnings record of the Oregon enterprise." The letter concluded with a request for rescission of the agreement and return of the $50,000 deposit, if defendant did not "wish to continue with efforts to obtain the mortgage loan" on the Farms. Plaintiff also wrote to defendant. The letter stated, "I am today in receipt of a letter addressed to me from Mr. Paul Sayre, in which you state more or less, that you would like to get out of the deal made between yourself and myself." Plaintiff explained his failure to obtain loans on the Farms by (1) the fact that he only had an option to buy rather than an outright purchase, and (2) the need for a five-year earnings record of the Farms. Defendant answered this letter personally. He expressed his disappointment that plaintiff's obligations had not been met, and defendant stated that there was no indication that plaintiff "would ever be able to do any better." He concluded that since the "matter has dragged so long * * * I must now leave it in the hands of my attorney." On July 14, 1960, Sayre wrote Powers that defendant rejected "any continuing obligations." Four days later Powers responded that defendant's disregard for plaintiff's request for earnings records constituted a breach of the agreements, that plaintiff was abandoning further attempts to perform, and he demanded the return of the $50,000 "earnest money deposit." Plaintiff filed this action on May 9, 1961.

If defendant was required to give reasonable notice before he declared a forfeiture of the $50,000, then plaintiff is entitled to a return of the $50,000. Morrison et al. v. Kandler et ux., 215 Or. 489, 499, 334 P.2d 459 (1959), is the most recent decision of the Oregon Supreme Court, collecting the authorities for the proposition that a vendee in a contract of sale may treat a wrongful forfeiture as if it were an offer to rescind, may acquiesce to the rescission, and then be placed in *statu quo ante*.

Defendant asserts that (1) defendant was not required to give notice prior

to forfeiting the $50,000 under the agreements between the parties; (2) plaintiff abandoned performance so that any notice would be a useless and unnecessary act; and (3) plaintiff repudiated the contract and thereby forfeited the $50,000.

Defendant also calls attention to the fact that the equities are with him and not with the plaintiff. Plaintiff is an experienced trader who during the early negotiations made it appear that he was desirous of and able to close the transaction. The $50,000 which he advanced represented less than two per cent of the purchase price. Plaintiff inserted a provision in the contract limiting his liability for his failure to consummate the deal. He also insisted upon financing it solely with the defendant's property without involving any of his own. He tried to make a quick profit of $1,500,000 by inflating values and using selective figures. When plaintiff was unable to sell or to finance it without using his own assets, if they were available for that purpose, he had his agent Smith attempt to get defendant to rescind the arrangement and return the money. When this failed, he tried to construe defendant's actions and words as a breach of their agreement, and later when he discovered that there was no such breach, he claimed a wrongful forfeiture and rescission.

There are several reasons why plaintiff is not entitled to prevail.

■ First, defendant was not required to give notice before declaring the $50,000 forfeited. Clause 13 of the contract gave the plaintiff as the prospective purchaser the election either to consummate the transaction by the payment of money and the transfer of property amounting to $2,641,000, or to forfeit $50,000 and pay actual damages not exceeding the sum of $200,000. This provision foreclosed the defendant from seeking specific performance of the contract. He was limited to a forfeiture of $50,000 plus his additional actual damages, if any, not exceeding $200,000.

Many cases hold that an option agreement or an earnest money agreement which does not permit the seller to obtain specific performance does not require notice of forfeiture; but regardless of how one labels a contract containing a provision like clause 13, it does not fall within the doctrine first announced in Higinbotham v. Frock, 48 Or. 129, 83 P. 536 (1906), that notice is required in those cases in which a default clause, inserted for the benefit of the vendor, gives the vendor alternative rights, including that of specific performance. In my view, the cases beginning with Scott v. Merrill's Estate, 74 Or. 568, 146 P. 99 (1915), and Potter Realty Co. v. Derby, 75 Or. 563, 147 P. 548 (1915), relating to earnest money contracts and option agreements, make clear that unless specific performance is permitted the vendor, he is not required to give notice of forfeiture. This line of authority controls the present case.

I do not express any view on the notice, if any, defendant would have been required to prove in order to establish his right to additional actual damages not exceeding $200,000. That issue is not before me.

■■ Second, I find that plaintiff, through his agent Smith, admitted his inability to perform his obligations under the contract. Such admission constituted an abandonment of the contract. Therefore even if the contract required notice prior to forfeiture, defendant was relieved of this requirement; plaintiff's abandonment of performance made the giving of such notice a useless act. Epplett v. Empire Inv. Co., Inc., 99 Or. 533, 543, 194 P. 461 (1921).

■ Third, plaintiff, and not the defendant, repudiated the contract. To constitute an anticipatory breach of an executory contract, one must refuse to perform one's obligation under the contract "positively, unconditionally, unequivocally, distinctly and absolutely." Swick v. Mueller, 193 Or. 668, 676, 238 P.2d 717, 720 (1952).

■ I do not read Sayre's letter as a repudiation of the contract, and neither plaintiff nor his attorney so interpreted

it at the time of its receipt. Sayre demanded performance. No performance was tendered, nor was a date set when plaintiff would be able to perform. Plaintiff and his attorney merely represented that plaintiff could not perform unless they were furnished with certain figures —figures which they had received six months earlier. On July 18, 1960, plaintiff unequivocally repudiated the contract. This repudiation, even though coupled with a demand for the return of the $50,000, entitled the defendant to declare a forfeiture and retain the money. Kemmerer v. Title & Trust Co., 90 Or. 137, 175 P. 865 (1918).

The foregoing opinion will serve in place of findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. However, the parties are not precluded from requesting additional findings.