Argued and submitted October 26, 1983; resubmitted In Banc July 11, affirmed October 10, reconsideration denied December 14, 1984; reconsideration on attorney fees denied January 4, both petitions for review denied March 6, 1985 (298 Or 773)

HOOVER et al,
*Appellants,*

*v.*

HEGEWALD et al,
*Respondents.*

(82-01-8132; CA A26761)

689 P2d 965

William F. Schroeder, Vale, argued the cause for appellants. With him on the briefs was Schroeder & Hutchens, Vale.

Roy Kilpatrick, Mt. Vernon, argued the cause for respondents. With him on the brief were Clif Ouellette and Kilpatricks & Pope, Mt. Vernon.

BUTTLER, J.

Rossman, J., dissenting.

**BUTTLER, J.**

Plaintiffs, purchasers under a land sale contract, appeal a decree dismissing their claims for rescission of that contract and granting defendants' counterclaim for strict foreclosure. We affirm.

Given our view of the case, a detailed statement of the evidence is unnecessary; we state only the material facts. The subject of the contract is a 16,000-acre ranch (the Green Valley Ranch), located 27 miles west of Burns, comprised of two separate parcels several miles apart, each of which has both farm and range land. Defendant Rudy Hegewald (Hegewald) is responsible for developing the ranch, a task he began in 1974. The other named defendants are Hegewald's wife and the three trustees of the Hegewald Family Trust, which owned part of the ranch. Hegewald consolidated the two parcels into a single ranch and made numerous improvements. He developed and installed a huge irrigation system utilizing eight wells from which water was delivered through a system comprised of center pivots, wheel lines and hand lines. He dug a new channel for a creek that flowed across the ranch and had flooded frequently. He filed applications for and obtained permits to appropriate water rights, and developed hundreds of acres for cultivation through leveling and fertilization. He also dug and repaired several miles of irrigation ditches on the ranch.

In the fall of 1978, Hegewald was in his late 70s. He had completed most of his work on the ranch and decided to sell it. Accordingly, he contacted Jett Blackburn, a realtor, about selling the ranch, having predetermined that its selling price would be $3,500,000. Blackburn advertised the ranch in several regional and national publications and received a number of inquiries. In response to each, Blackburn sent an information packet containing general information about Harney County, specific information about the ranch and a set of maps of the entire property.

Plaintiff Dr. Galen Hoover (Hoover) is an orthopedic surgeon from Tacoma, Washington. Before his acquisition of the Green Valley Ranch, he owned a farm comprised of about 440 acres near Rainier, Washington, on which he raised cattle. He employed his son, Galen Hoover, Jr., (Galen) to manage

the farm. Galen's only experience in agriculture was gained while working for his father.

In late February or early March, 1979, while attending a livestock sale in Caldwell, Idaho, Galen was contacted by Doug Campbell, a salesman for Blackburn, who had learned of plaintiffs' interest in acquiring a larger ranch. He suggested that the Green Valley Ranch might suit plaintiffs' needs. Galen and his wife stopped off in Burns on their way back to Washington. Campbell took them on a 45-minute driving tour of the ranch and gave them a copy of the information packet, in which it was stated that the ranch was comprised of (a) 1,200 acres of irrigated alfalfa, (b) 1,233 acres of irrigated grain, (c) 120 acres of other land developed for irrigation, (d) 110 acres of native meadow, (e) 1,000 acres of additional potential farmland, which could be developed and irrigated with water from a proposed reservoir for which defendants had water rights permits, and (f) 12,608 acres of native pasture. It also listed the structures located on the ranch and the grazing rights appurtenant to the deeded land. With one exception, that packet was identical to the ones that had been distributed to other interested persons. That exception is that the other packets stated the cattle capacity of the ranch was 800 head of cattle on a year-round basis, whereas that statement was deleted from the packet that Campbell gave to Galen. In lieu thereof, Campbell orally represented to plaintiffs that the ranch could sustain 1,000 head of cattle on a year-around basis.

On March 10, 1979, Hoover and Galen were flown to Burns, where they were met at the airport by Campbell, who showed them the ranch again. He represented that there were 2,433 acres of irrigated farmland and reiterated that the ranch could sustain a 1,000-head herd. He also suggested ways in which the cattle capacity could be increased to over 2,800 with relatively inexpensive and simple changes in ranch management. Campbell professed considerable personal knowledge about ranching in general and about Eastern Oregon cattle ranching in particular.

Negotiations followed over the next few weeks, culminating in the execution of a land sale contract in mid-April, 1979. Counsel for both parties participated in the

preparation of the contract. In exchange for the ranch, plaintiffs transferred their farm in Rainier to defendants as a down payment and received a credit of $923,000 towards the purchase price. After some other initial payments, the balance of $2,383,000 was to be paid in 15 installments, due each year on the 15th of January.

Hoover placed his son, Galen, in charge of the ranch and returned to Tacoma. Hegewald offered to help them with the ranch and suggested that they retain two of his key employes. Galen not only declined both the offer and suggestion, he terminated all of defendants' employes and brought in two of his friends. By the end of the first season, the ranch had lost over $90,000, which Galen attributed to his lack of experience and unfamiliarity with the ranch. Losses increased to $245,000 during the second year.

Hoover, concerned about the ranch's financial performance, spoke with Blackburn and Campbell, who blamed Galen's poor management for the problems. In August, 1980, Blackburn and Campbell approached Hoover and convinced him to list the ranch with them for sale at a price of $4,500,000. A number of offers were made from various parties to buy all or part of the ranch, but none was accepted by plaintiffs. With the listing due to expire on the first of the year, Blackburn and Campbell went to Tacoma during the last week of 1980 to get a new listing signed and to offer to manage the ranch for plaintiffs for $1,500 to $2,000 per month. Both of those proposals were rejected.

By that time, Hoover had met Elmer Johnson, who claimed to have substantial experience in evaluating Eastern Oregon ranches. Johnson was retained by Hoover and, after completing a preliminary evaluation of the ranch, he reported on February 17, 1981, that he believed that the characteristics of the ranch had been misrepresented. He suggested that plaintiffs get a lawyer, which they did. At about this time, plaintiffs rejected a $4,000,000 offer to buy the ranch. On April 17, 1981, their lawyer wrote a letter to defendants purporting to rescind the land sale contract. The letter reads, in pertinent part:

> "The purchasers rescind, tender the property of the Real Estate Contract, and hold themselves for their payment to the sellers of its fair market rental value during their possession,

conditioned only upon the sellers putting them in status quo ante."

Plaintiffs, however, remained in possession and continued to operate the ranch.

Plaintiffs did nothing further toward effecting a rescission until December, 1981, when they wrote defendants another letter asserting that the contract had been rescinded as of April, 1981. Defendants responded by letter, rejecting any contention that a rescission had occurred. On January 14, 1982, plaintiffs filed a complaint for rescission in which they alleged that defendants had misrepresented the characteristics of the ranch by exaggerating (1) its cattle carrying capacity, (2) the number of acres of actual and potential farmland, (3) the annual crop yield and (4) the amount of profit plaintiffs could expect to make in operating the ranch. Plaintiffs refused to make the annual payment due on January 15, 1982.

Defendants answered on March 1, 1982, by way of a general denial and asserted several counterclaims, including one for strict foreclosure, which declared the entire unpaid balance due and payable, and one alleging that plaintiffs were responsible for $30,216.66 in damages to the ranch and equipment. Defendants also petitioned for the appointment of a receiver, but before that petition could be heard, plaintiffs filed a "possession notice" with the county clerk, reiterating their position that the contract had already been rescinded and stating their intention to quit possession on April 15, 1982. On April 15, almost one full year after they purported to rescind, plaintiffs did in fact abandon the ranch.

Hoyt & Sons (Hoyt), an agricultural partnership, had been interested in acquiring the ranch for a long time. When plaintiffs abandoned the ranch, defendants put Hoyt in possession with authority to operate the ranch. On April 23, 1982, defendants and Hoyt entered into a one-year lease for $62,500, plus an additional amount that was tied to the level of hay and grain production. Defendant also agreed orally that Hoyt would have an option to buy the ranch for $3,000,000 plus Blackburn's as yet unnegotiated sales commission, on terms that were satisfactory to both of them.

This case came to trial on August 18, 1982. There is conflicting evidence on whether the ranch could support 1,000

head of cattle and on whether the ranch had significantly fewer irrigated and irrigable acres than was represented. Those representations are the only ones urged on appeal. Because credibility of the witnesses is an important factor, we give substantial weight to the findings of the trial judge, although we review *de novo. Wilkinson v. Carpenter,* 276 Or 311, 554 P2d 512 (1976). Plaintiffs do not contend that defendants made any misrepresentations; if any were made, they were made by their agents, Blackburn & Campbell. The trial court found that there was not clear and convincing evidence that the representation defendants' agents made were false, and that even if they were, there is no evidence that they were made fraudulently; accordingly, it concluded that, under *Wilkinson v. Carpenter, supra,* they could not be the basis for rescission of the contract in the light of the clause in the contract that provided:

> "Sellers or their agents have made no representations and have extended no warranties other than those expressly set forth herein and purchasers are purchasing said realty pursuant to their own independent examination, study and inspection and purchasers well realize that profit or loss of the operation of a ranch has many variables including but not limited to management, economic conditions, price of cattle, costs of operation and weather, and purchasers are relying on their own abilities, financial resources and chances of economic conditions and prices for products either bought or sold and that they are not in any way relying upon any representation made by the sellers or their agents as to the economic feasibility of the operation of said ranch."

■■ On appeal, plaintiffs contend that the evidence was clear and convincing that each of the representations was false and that even if they were not made fraudulently, *Wilkinson v. Carpenter, supra,* does not preclude a rescission of the contract. Rather than review all of the conflicting evidence relating to the three alleged misrepresentations, we conclude, as did the trial court, that if they, or any of them, were false, they were made innocently, not fraudulently. The issue, then, is whether *Wilkinson* bars rescission based on non-fraudulent misrepresentations. Although plaintiffs acknowledge that that case bars rescission for non-fraudulent misrepresentations when the contract contains a "disclaimer" provision, they contend that the contract provision here is insufficient to invoke the rule in that case.

We are not persuaded that the contract provision in *Wilkinson* was different in any material respect from the one here involved, quoted above. The *Wilkinson* contract provided:

> " '7. *Warranties*. It is understood and agreed that all the properties sold hereunder are sold "as is" and that there have been no warranties expressed or implied as to the condition of the properties or representations made with reference to the business known as "Dad's" or real property which have induced the purchasers to purchase either of the properties described in paragraph 1, hereinabove.' " 276 Or at 313 n 2.

In that case, the sellers sought specific performance of the contract, and defendants counterclaimed for rescission. In affirming a judgment for the plaintiffs, the trial court said:

> "* * * Defendants argue—and we agree—that normally it would not be necessary for them to prove that the inducing misrepresentations were made fraudulently in order to entitle them to rescind. *See, e.g., Souza v. Jackson Co. Fed S. & L.,* 256 Or 220, 472 P2d 272 (1970). However, in this case the contract contained a clause specifically excluding any prior warranties and declaring that there had not been any representations made which induced defendants to purchase the property. Although such a clause will not preclude relief upon a showing of *actual* fraud, *see, e.g., Farnsworth v. Feller,* 256 Or 56, 471 P2d 792 (1970), it does prevent defendants from relying upon any innocent misrepresentations as the basis for a suit for rescission." 276 Or at 314. (Emphasis in original.)

■ Although the trial court also made findings and conclusions in favor of defendants on their defenses of laches and accord and satisfaction, we need not consider them, because we conclude that plaintiffs failed to establish grounds for rescission by clear and convincing evidence. However, plaintiffs also contend that the trial court erred in failing to find that defendants joined them in a mutual rescission, and in granting plaintiffs strict foreclosure, damages and attorney fees. Because there is some disagreement within the court as to whether a mutual rescission occurred, we will discuss that assignment at some length.

Plaintiffs had made two attempts prior to filing this lawsuit to rescind the contract. Both were rejected by defendants, and plaintiffs remained in possession. It was not until after plaintiffs filed this action for rescission and defendants

filed a counterclaim for strict foreclosure and applied for the appointment of a receiver that plaintiffs filed a "notice of abandonment" and vacated the ranch. When plaintiffs actually abandoned the property, the authority for a court-appointed receiver terminated, because the property was no longer "in the possession of an adverse party." ORCP 80(B)(1).[1] For that reason, there was no point in defendants' attempting to pursue their application for a receiver. At that point, defendants had the choice of leaving the ranch unoccupied or of taking possession in order to preserve it and, in this case, rehabilitate it from the run-down condition in which plaintiffs left it.

There is no doubt that defendants' decision to take possession of the abandoned ranch was not only wise, but was legally permissible. In *Nygaard et ux v. Anderson,* 229 Or 323, 366 P2d 899 (1961), the court, acknowledging a vendor's right to repossess the property, went on to state that

"* * * where the premises are unoccupied and vendor resumes possession after filing a suit to foreclose, in the absence of evidence indicating an intent to disaffirm the contract or circumstances inconsistent with the existence of the contract, it will be assumed that possession is taken to protect vendor's security interest pending the suit to foreclose." 229 Or at 333.

In *Morrison et al v. Kandler et ux,* 215 Or 489, 334 P2d 459 (1958), the court, in applying that rule, stated:

"* * * To hold otherwise would put a premium on the conduct of a purchaser who refuses to perform his contract and vacates the property. * * *" 215 Or at 506-07.

Although the dissent pays lip service to that rule, it seems to say that a combination of facts amounted to evidence of an intention of defendants to accept plaintiffs' attempt to rescind. We find no such evidence. By seeking strict foreclosure of the contract, defendants elected to affirm and

---

[1] ORCP 80(B)(1) provides:

"B Subject to the requirements of Rule 82A(2), a receiver may be appointed by a circuit court in the following cases:

"B(1) Provisionally, before judgment, on the application of any party, when such party's right to the property, which is the subject of the action, and which is in the possession of an adverse party, is probable, and the property or its rents or profits are in danger of being lost or materially injured or impaired."

enforce the contract and by so doing, they waived their right to declare a forfeiture, as permitted by the contract. *Nygaard et ux v. Anderson, supra.* Given that clear act of affirmance of the contract by defendants, if they had been able to have a receiver appointed, they would not have evinced an intent to acquiesce in a rescission. As already noted, defendants' effort *to obtain a receiver was frustrated by plaintiffs' abandonment* of the ranch. Given that legal block, defendants' taking possession in order to protect the property and to pay taxes and two mortgages was the only reasonable recourse available to them. As a matter of law, their possession was for the benefit of both themselves and plaintiffs, and if plaintiffs had demanded an accounting in their pleadings, defendants could have been required to account to them for any profits that they received by applying them on the moneys owed under the contract.

Given defendants' right to assume possession of the ranch, they were entitled to lease it to Hoyt rather than to operate it themselves. Rudy Hegewald, who had developed and operated the ranch before its sale to plaintiffs, was then in his 80s. There is no reason why defendants could not have a third party operate the ranch. Given the size of the operation, a one-year lease was reasonable, if not necessary. It appears, although not clearly, that the dissent is troubled by the fact that the lease contained no express provision making it subject to plaintiffs' interest in the ranch or contingent on the outcome of this suit. That is a phantom concern; it is clear that Hoyt had actual knowledge of both the contract and the lawsuit, and that both defendants and Hoyt recognized that nothing could be done with respect to a sale of the property until the litigation was concluded. Clearly, it cannot be said that plaintiffs' interest was not seen as a barrier to the possible sale. In any event, the lease was subject to the recorded contract and was also subject to the outcome of the lawsuit as a matter of law under the doctrine of *lis pendens.*

Neither does the "oral option" to purchase the ranch evince an intention on the part of defendants to acquiesce in a rescission of their contract with plaintiffs. *No one* contends that there was an enforceable option or agreement, and there was none. Defendants were simply looking ahead to the fairly definite prospect of re-acquiring the ranch, either because of plaintiffs' prevailing in their rescission action or because of

defendants' prevailing in their counterclaim for strict foreclosure. *Nothing* can be made of the unsigned memorandum outlining the terms of a possible sale, except the clear inference that the memorandum was not signed for the reason that both parties realized that defendants did not have authority to sell the property or to grant an option for its sale until the lawsuit was resolved finally. It is obvious that it is for that reason that the ranch was leased rather than sold. In other words, the rights of plaintiffs as contract vendees *were* recognized. The dissent's statement that defendants would not have been negotiating to sell the ranch if they had been sincere about enforcing the contract is inexplicable. Defendants would have been foolish not to have done so and nothing they did prejudiced plaintiffs in any way and no contention is made that it did.

The dissent's reliance on *Montgomery v. Heider,* 147 Or 523, 34 P2d 657 (1934), and *Macomber v. Waxbom,* 213 Or 412, 325 P2d 253 (1958), is misplaced. Each of those cases presented clear instances of a vendor's attempting to effect a forfeiture without notice to the vendee. In *Montgomery v. Heider, supra,* the vendees had purchased a farm and, although they were living where one of them had a job during the depression, rather than on the farm, they kept many of their belongings in the farm house and leased most of the land under a crop rental. The vendor, without notice, rescinded the contract and leased it to another. When the vendees learned of the lease, they contacted the vendor, who said that he had retaken the property. The vendees were held entitled to accept the vendor's rescission.

In *Macomber v. Waxbom, supra,* the vendor, while visiting the vacation cottage he had sold on contract to the vendees, changed the locks on the doors, kept the keys and did not notify the vendees of his action. He then filed a suit for strict foreclosure, and the vendees counterclaimed for rescission. The court held that the vendor had repudiated the contract when he locked the vendees out of the property, thereby entitling the vendees to rescind. In both cases, the vendor repudiated the contract and then attempted to foreclose it. Neither has any application here.

We conclude that no mutual rescission occurred. As stated earlier, although defendants were entitled to take

possession of the ranch, if they realized any profit from its operation, they could be required to account for the amount thereof by deducting it from the amounts plaintiffs are required to pay in order to avoid the foreclosure of their interest. That issue was not raised in the pleadings, and it does not appear to have been argued to the trial court. Plaintiffs have raised it in this court for the first time in a very cursory manner without any reference to the transcript. *See* ORAP 7.19. We decline to search the record to determine whether defendants derived any profit from the lease.

■ It follows that defendants are entitled to strict foreclosure of the land sale contract. There remain plaintiffs' contentions that the trial court erred in awarding damages to defendants and in awarding defendants attorney fees in this action. First, the damage award is based on evidence that defendants, after repossessing the ranch, expended certain sums to repair damage done by plaintiffs to irrigation and other equipment and to some of the improvements on the property. We find that the evidence supports the award, and affirm it.

■ Second, plaintiffs contend that the contract does not authorize an award of attorney fees and that even if it does, the amount awarded is not supported by the record. The contract provisions are somewhat unusual. The provision that is most applicable here provides:

> "Or, the sellers may declare the entire unpaid balance of this real estate contract due and owing and, upon sellers' election so to do, the purchasers' obligations to do so will be fixed and all costs in collecting the same, including attorney's fees, title insurance and searches, and expert fees of any and all kinds, shall be paid by the purchasers, including the same costs in the event of an appeal."

It is plaintiffs' contention that defendants are entitled only to attorney fees for their efforts to collect the unpaid balance of the purchase price, not for defending against plaintiffs' rescission action. That argument overlooks the fact that in order for defendants to obtain strict foreclosure of the contract and, hence, collect the contract balance, it was necessary to avoid plaintiffs' attempted rescission. Defendants are entitled to attorney fees, and the amount awarded was within the trial court's discretion.

Affirmed.

**ROSSMAN, J.,** dissenting.

I disagree with the result reached by the majority for several reasons. Foremost among these is what I perceive to be an erroneous characterization of the parties' conduct in this case. I believe an objective look at defendants' conduct would show that their actions repudiated the contract and constituted an acquiescence in plaintiffs' rescission.

The majority acknowledges that mutual rescission by acquiescence is a viable legal theory in Oregon. This concept has been referred to numerous times, but has never been raised in a case which presented the proper facts for its application. *See Nygaard et ux v. Anderson,* 229 Or 323, 330-31, 366 P2d 899 (1961); *Morrison et al v. Kandler et ux,* 215 Or 489, 499, 334 P2d 459 (1959). The general rule with respect to this theory is that:

> "* * * If a purchaser repudiates the contract without cause, or attempts to do so after he has lost his right by undue delay, * * * a vendor, who has resumed possession and elected to sue for foreclosure, is given a reasonable latitude in operating the property pending the final determination of the suit." *Miller et ux v. Barker et ux,* 233 Or 113, 122, 377 P2d 343 (1962).

If a seller stays within that latitude, the contract will remain in full effect; but, if he exceeds it, his conduct will actually effect a change in the legal rights of the parties. *See Morrison et al v. Kandler et ux, supra.* In other words, a party can acquiesce in even a wrongful recission and thereby effect a mutual rescission. 215 Or at 499.

The determining factor in cases of this type is whether the conduct of the seller evinces an intent to repudiate the contract. In *Nygaard,* the court framed the issue this way:

> "* * * If [the sellers] resumed possession for the purpose of revesting in themselves the full interest in the premises, forfeiting the equitable interest of the defendant, their conduct would, of course, be inconsistent with the theory of affirmance upon which the suit to foreclose is predicated. Moreover, such conduct would be wrongful because, as we have already observed, [the sellers,] in filing the suit to foreclose, waived their right to repossess the property under the forfeiture provision of the contract. If, however, [the

sellers'] resumption of possession was not intended as a negation of defendant's possessory and equitable interest in the property, there is no such inconsistency and [the sellers] would then be entitled to prevail. * * *" 229 Or at 331.

Although, as previously noted, I have been unable to discover any Oregon cases in which a seller has been held to have acquiesced in a mutual rescission by his conduct, there are cases in which a seller's conduct has been held to be a repudiation of a contract giving the buyer a right to rescind. In *Montgomery v. Heider,* 147 Or 523, 34 P2d 657 (1934), a seller who had leased to a third party property that he had previously sold under contract to the plaintiffs was held to have repudiated the contract wrongfully. In *Macomber v. Waxbom,* 213 Or 412, 325 P2d 253 (1958), a seller's actions in removing the buyer's padlocks from cabins sold by contract and replacing them with his own also was deemed to have given the buyer the right to rescind. Admittedly, these cases were not decided on the basis of a mutual rescission. However, contrary to what the majority states, these cases are relevant to our resolution of the instant case, because they provide some indication of the type of conduct which constitutes a repudiation of a land sale contract when engaged in by a seller.

The majority has managed to avoid finding a mutual rescision by concluding that defendants' actions were proper in response to plaintiffs' dereliction and carelessness. I beleive that an objective account of the facts necessitates a different result.

Plaintiffs unequivocally rescinded the contract, by letter, in April, 1981, shortly after learning that the ranch's characteristics had been misrepresented by Blackburn and Campbell. Although plaintiffs could have abandoned the property at once, I see no reason, under the circumstances, why it was not also perfectly proper for them to remain in possession. Moreover, having intially decided to remain in possession did not in any way preclude them from later abandoning the property as was done in April, 1982.

Of even greater significance is defendants' conduct. It was probably necessary for them to lease the ranch to Hoyt for an entire year. It was important that the ranch not be allowed to deteriorate, and it is unlikely that anyone would have been willing to operate it on a month-to-month basis. However,

defendants dealt with the property as owners, indifferent to the rights of plaintiffs and with no apparent regard for the contract. The lease contained no provision making it subject to plaintiffs' interest in the ranch or contingent on the outcome of this suit. Moreover, if defendants were actually intent on enforcing the contract, then they were required to account to plaintiffs for the reasonable rental value of the ranch and for any personal property disposed of by them. *Morrison et al v. Kandler et ux, supra,* 215 Or at 508. There is no evidence that defendants set aside for plaintiffs' benefit the rental income received from Hoyt or that they had even considered doing so.

On these facts alone, the mutual rescission question is a very close one. At best, defendants' conduct with respect to the lease evinced indifference to the sale contract and to the rights of plaintiffs. However, the question is not so close when we consider that defendants entered into an oral option agreement to sell the ranch to Hoyt. In his testimony, the only condition which Stephen Hoyt mentioned as potentially standing in the way of an eventual sale was financing. This strongly suggests that plaintiffs' interest was not seen as a barrier to the deal with defendants. The fact that the oral option may have been unenforceable is irrelevant on the issue of mutual rescission. What is relevant is that the granting of an option to purchase, orally or otherwise, shows an intent on the part of defendants, that is inconsistent with the continued existence of the contract. Had defendants actually been sincere about enforcing the contract, they would not have been negotiating to sell the ranch to Hoyt.

Even after allowing for reasonable latitude in dealing with the ranch, it appears that defendants' actions in this case were at least as inconsistent with the contract as were the actions of the respective sellers in the *Montgomery* and *Macomber* cases. In their transactions with Hoyt, defendants appear to have disregarded totally plaintiffs' interest in the ranch. They cannot have it both ways, insisting in court and in their interactions with plaintiffs that the land sale contract is binding while simultaneously leasing the entire ranch to Hoyt for one full year, keeping the income it generated and preparing to consummate its sale. Accordingly, even assuming that plaintiffs' repudiation of the contract and abandonment of the ranch were wrongful, I would hold that defendants' actions

exceeded the leeway to which they were entitled and, therefore, evinced an intent to repudiate the contract. Defendants joined in a mutual rescission. Therefore, I would reverse.